1

2

3

4

5

6

7

8

9

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

10

11

12

13

14

15

16

CHRIS BUNGER,

      Plaintiff,

   v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

     Defendant.

No.  2:15-cv-01050-RAJ

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52

NOTE ON MOTION CALENDAR: **02/19/2016**

17

18

19

20

21

22

23

24

## I.   RELIEF REQUESTED AND OVERVIEW OF MOTION

Plaintiff Chris Bunger respectfully moves this Court under Federal Rule of Civil

Procedure 52 ("Rule 52") to enter judgment declaring him disabled within the meaning of

disability insurance policies governed by the Employee Retirement Security Income Act, 29

U.S.C. § 1001 *et seq.*, ("ERISA"), based on the administrative record in this matter.[1]

Mr. Bunger has Chronic Fatigue Syndrome.  His doctor also diagnosed lyme disease.  He

experiences debilitating fatigue, which interferes with his ability to focus and think clearly.  The

condition worsened, and he became unable to continue working full-time.  Over a period of

25

26

27

---

[1] That record has been filed in paper copy pursuant to ECF Procedure I.  It is comprised of two
parts, marked "UA-CL-STD" and "UA-CL-LTD" in the lower right corner of each page.  Pages
are referred to here by "STD" or "LTD" and the last three digits of the number that follows.  A
working copy of the record, with highlighting, was submitted to the Court under LR 10(e)(9).

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 1

NO. 2:15-cv-01050-RAJ

months, Mr. Bunger alternately did not work at all, or worked part-time.  He applied for disability benefits.  Unum Life Insurance Company of America ("Unum") agreed Mr. Bunger was disabled, and approved his disability benefits on four separate occasions.  Then, six weeks before Mr. Bunger would have exhausted his short-term disability and transitioned to long-term disability benefits, Unum terminated his claim.  Mr. Bunger's health had not substantially improved from when Unum first deemed him disabled.

Without benefit of an attorney, Mr. Bunger submitted the ERISA-required appeal to Unum.  He addressed the sole basis Unum gave for terminating benefits – whether he was correctly diagnosed with lyme disease.  Unum denied the appeal.  Unable to explain the logical conundrum presented by terminating disability benefits when there had been no improvement in Mr. Bunger's health, Unum told him he never had been disabled.

Although Unum did not mention Mr. Bunger's Chronic Fatigue Syndrome ("CFS") in its letter terminating benefits, its letter denying his appeal *did* address that condition.  It told Mr. Bunger there was "no serologic, metabolic, endocrine, infectious or hematological support" for his CFS diagnosis.  Yet a hallmark of CFS is that no laboratory test can establish the illness.

At issue is whether Mr. Bunger was disabled for the final six weeks of coverage under the short-term disability policy, and whether he was disabled under the long-term disability policy for the following nine months.  For the reasons set forth below, this Court should declare Mr. Bunger disabled during those times, and enter judgment in his favor.

## II.  FACTUAL BACKGROUND

### A.  Mr. Bunger Has Short-Term and Long-Term Disability Insurance, For Which Unum Both Administers and Pays Claims.

Costco Wholesale Corporation ("Costco") has employed Mr. Bunger for fifteen years.  LTD-005.  When Mr. Bunger became ill, he was working as a "Web Content Specialist," setting up items on Costco's website; ensuring the accuracy and organization of the website's content; coordinating and implementing changes to that content; and preparing and executing campaigns and promotions.  LTD-368.  The work requires "excellent written and verbal communication

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 2

NO. 2:15-cv-01050-RAJ

LAW OFFICE OF MEL CRAWFORD
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1  skills" and "strong organizational and analytical skills and attention to detail." *Id*.  It requires

2  one to perform and direct multiple tasks simultaneously, work cooperatively with others, give

3  training or instruction, maintain composure under all circumstances, work autonomously and

4  make independent judgments.  LTD-370.

5      Mr. Bunger participates in the Costco Employee Benefits Program – Voluntary Short

6  Term Disability Plan Benefits ("the STD Plan") and the Costco Employee Benefits Program –

7  Long Term Disability Plan Benefits ("the LTD Plan").  STD-378; LTD 450.  Unum insures and

8  administers both Plans.  It decides whether to approve or deny claims, and pays benefits for those

9  it approves.  STD-378-79; LTD-450-51.

10      A person is disabled under the STD Plan if "limited from performing the material and

11  substantial duties of your own job . . . due to your sickness . . .  and you have a 20% or more loss

12  in weekly earnings due to the same sickness."  STD-367.  The LTD Plan defines "disabled" in

13  the same terms, except that after nine months the definition changes to an "any occupation"

14  standard not relevant here.  LTD-428.  The Plans define "material and substantial duties" as

15  duties "normally required for the performance of your own job" which "cannot be reasonably

16  omitted or modified."  STD-376; LTD-447.

17  **B.  Mr. Bunger Becomes Ill and Applies for Short-Term Disability Benefits.**

18      On January 3, 2014, Mr. Bunger became lightheaded, weak and "cloudy" while driving

19  to work.  He was unable to continue driving.  LTD-074; LTD-100; LTD-333.  Mr. Bunger's

20  treating doctor, Traci Taggart, N.D., summarized his subsequent course:

> Following this episode Mr. Bunger began experiencing these symptoms more
> regularly.  He would feel very "out of it", would be unable to connect thoughts,
> speaking became much more slow as it was difficult to form thoughts, and felt
> very fatigued. These symptoms would occur as episodes that lasted longer and
> longer and then became fairly constant over the following weeks. These episodes
> were at times accompanied by anxiety.  A brain MRI done at the time was
> normal, as were most of his labs to rule out autoimmune conditions. In February
> he was transported to the ER by EMS following an incident where he became
> very dizzy and confused, was seeing black spots and felt like he was going to pass
> out. He also developed severe pain in his legs and lower back. He had a neurology
> consult while at the ER, including a second MRI, and all was normal.

27  LTD-333.

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 3

NO. 2:15-cv-01050-RAJ

LAW OFFICE OF MEL CRAWFORD
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

This was a change from Mr. Bunger's prior state of good health.  Dr. Taggart, who has provided him medical care since 2012, states that despite some fatigue he "remained healthy until the sudden onset of his illness in early 2014."  LTD-374.  Until 2014, Mr. Bunger "was able to work and actively participate in raising his family and managing his family's household[.]"  *Id*.  Dr. Taggart "noted a very sudden change in Mr. Bunger's cognitive abilities, ability to engage with others around him, irritability [and] level of fatigue" in January 2014.  LTD-375.

Mr. Bunger saw Dr. Taggart on January 10, 2014.  He reported fatigue and feeling "out of it," that he had a "hard time ordering thoughts," and that he had been unable to drive.  LTD-070.  Dr. Taggart noted Mr. Bunger "speaks very slowly, but not slurred" and wrote "earlier words didn't sound like a sentence."  *Id*.  With respect to his psychiatric condition, Dr. Taggart found Mr. Bunger alert and oriented, that his judgment and insight were normal, that his memory was intact and his mood and affect appropriate.  *Id*.  She diagnosed "CFS Fatigue / Malaise," and ordered virus testing and other labs.  LTD-071.

 Dr. Taggart completed a Costco medical leave form on January 21, 2014.  LTD-099-102.  She stated that Mr. Bunger could "intermittently" perform his job functions, but would need to be absent from work during flare-ups of his condition.  LTD-100.  On February 7, 2014, Dr. Taggart completed a Unum "Attending Physician's Statement."  STD-049.  As Unum requested, she provided Mr. Bunger's diagnoses using ICD-9 codes:

780.71 (Chronic Fatigue Syndrome)

799.51 (Attention or Concentration Deficit)

088.9 (Arthropod-Borne Disease Unspecified)

337.9 (Unspecified Disorder of Autonomic Nervous System)

STD-049.[2]  Dr. Taggart wrote that Mr. Bunger was "experiencing episodes of severe fatigue, lightheadedness and inability to focus or concentrate" and that these "episodes make it

---

[2] ICD-9 codes are at https://www.cms.gov/site-search/search-results.html?q=icd-9%20codes. The above codes were obtained from that site on January 4, 2016.  A court may take judicial notice of ICD-9 codes.  *Marsh v. San Diego Cty.*, 432 F. Supp. 2d 1035, 1044 (S.D. Cal. 2006).

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 4

NO. 2:15-cv-01050-RAJ

1  impossible to drive and difficult to work." *Id*.  She noted that he had tested positive for lyme

2  disease (the third diagnosis identified above).  That positive result was obtained on January 16,

3  2014, using the IgM Western Blot test.  LTD-087.

4         According to the United States Centers for Disease Control and Prevention ("the CDC"),

5  Chronic Fatigue Syndrome ("CFS") "is a devastating and complex disorder" resulting in

6  "overwhelming fatigue and a host of other symptoms that are not improved by bed rest and that

7  can get worse after physical activity or mental exertion."[3]  People with CFS "often function at a

8  substantially lower level of activity than they were capable of before they became ill." *Id*.

9  "Besides severe fatigue, other symptoms include muscle pain, impaired memory or mental

10  concentration, insomnia, and post-exertion malaise lasting more than 24 hours." *Id*.  "Because

11  there is no blood test, brain scan, or other lab test to diagnose CFS, it is a diagnosis that can only

12  be made after ruling out other possible illnesses." *Id*.

13       **C.   Unum Agrees Mr. Bunger is Disabled; He Returns to Part-Time Work.**

14         Unum agreed that Mr. Bunger was disabled as of January 14, 2014.  STD-056-58.

15  Because Mr. Bunger returned to work on January 27, 2014, Unum approved payment of his

16  disability benefits through January 26, 2014.  STD-056-57.

17         Mr. Bunger soon found that his fatigue limited his ability to perform his work.  He went

18  out on medical leave again, on February 17, 2014.  On February 22, 2014, he had an episode of

19  dizziness, weakness and confusion of such severity that he went by ambulance to Northwest

20  Hospital.  LTD-293-308.  A neurologist evaluated him.  LTD-295.  An MRI of Mr. Bunger's

21  brain was normal, as were chest X-rays and an EKG.  LTD-295-96; LTD-302.

22         Mr. Bunger saw Dr. Taggart on March 4, 2014.  He felt fatigued, weak and mentally

23  slow.  LTD-064.  He described episodes of extreme fatigue, even when he had slept through the

24

25

26

27

---

[3] http://www.cdc.gov/cfs/general/index.html (last visited January 9, 2016).  Courts may take judicial notice of CDC publications. *See, e.g., Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 (1st Cir. 2010); *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1191 n.1 (N.D. Cal. 2014); *In re Agent Orange Prod. Liab. Litig.*, 689 F. Supp. 1250, 1274 (E.D.N.Y. 1988).

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52  Page 5

NO. 2:15-cv-01050-RAJ

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1    night, and at times "felt like on verge of losing consciousness" although he "did not black out."

2    *Id.* These incidents made him "nervous," but Dr. Taggart noted no psychiatric abnormalities. *Id.*

3         Mr. Bunger re-applied for STD benefits on March 4, 2014.  STD-073.

4         After being off work entirely from February 10 through March 17, Mr. Bunger returned

5    to part-time work on March 18, 2014.  *See* STD-419; LTD-265 (calendar showing leave); STD-

6    426 (explanation of calendar).  *See also* STD-144 (Unum memorandum correctly noting that Mr.

7    Bunger worked part-time from January 14, 2014 to early May 2014, although incorrectly

8    identifying the specific dates).  When Mr. Bunger returned to work on March 18, Dr. Taggart

9    advised that he would "have periods where he is unable to work . . . that are longer than 5 days in

10   a row" and "may also have periods that are asymptomatic."  STD-131.

11        On March 24, 2014, Mr. Bunger saw Dr. Taggart's colleague, Bobbi Lutack, N.D., and

12   described dizziness, constant flu-like symptoms, nausea, sleep disruption and being "really

13   tired."  LTD-060.  Dr. Lutack diagnosed "CFS, brain fog, immune dysregulation and sleep

14   disturbance."  LTD-061. When seen on March 31, 2014, Mr. Bunger again described dizziness,

15   nausea and disrupted sleep.  LTD-058.  Dr. Lutack noted the same diagnoses as before.  LTD-

16   059.  Mr. Bunger saw Dr. Lutack again on April 7, 2014.  He described continuing fatigue, and

17   difficulty sleeping.  LTD-056.  Dr. Lutack prescribed antibiotics and Flagyl (an antiprotozoal and

18   antibacterial drug)[4].  *Id.*

19        When seen by Dr. Taggart on April 22, 2014, Mr. Bunger reported having worked about

20   24 hours the previous week.  LTD-052.  (Costco's time records show that during the first weeks

21   of April, Mr. Bunger was working approximately 6 hours a day, and occasionally missing an

22   entire day.  LTD-419).  He continued to "have episodes of lightheadedness & panic/anxiety"

23   which "came out of nowhere."  *Id.*  He was unable to take care of his children on his own.  Dr.

24   Taggart noted hepatomegaly (enlargement of the liver),[5] clonus (a series of alternating

25   contractions and partial relaxations of a muscle that is believed to result from alteration of the

26

27   [4] http://c.merriam-webster.com/medlineplus/metronidazole (last visited January 5, 2016).
     [5] http://c.merriam-webster.com/medlineplus/hepatomegaly (last visited January 5, 2016).

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 6

NO. 2:15-cv-01050-RAJ

1   normal pattern of motor neuron discharge),[6] positive Hoffman's sign and swelling.  LTD-052;

2   see also STD-144 (Unum summary of office visit).  She prescribed Gabapentin and advised Mr.

3   Bunger to continue using Trazodone for sleep.  LTD-053.  Mr. Bunger saw Dr. Taggart again on

4   April 29, and reported no change in his energy during the previous week.  He stated that he felt

5   "like has flu a lot."  LTD-050.

6   **D.  Mr. Bunger's Condition Worsens; Unum Three Times Deems Him Disabled.**

7   Mr. Bunger's condition worsened in May 2014.   On May 9, 2014, he presented at Dr.

8   Taggart's clinic for an IV infusion.  He had been able to work only 2-3 days a week.  He

9   continued to be unable to care for his children, and required frequent naps.  LTD-048.  Dr.

10   Taggart completed a Family and Medical Leave Act ("FMLA") form stating that Mr. Bunger "is

11   experiencing symptoms of extreme fatigue, dizziness, and inability to focus" and that he was

12   "unable to perform work due to these symptoms."  STD-134.

13   On May 15, 2014, Dr. Taggart noted Mr. Bunger had some muscle weakness and tremors

14   when she tested his strength.  LTD-046.  Despite some improvement from the previous week, he

15   had "overall fatigue a lot," "brain fog" and had been "very confused last week."  *Id*.  The veins in

16   Mr. Bunger's left wrist were "very sore to touch" despite any recent trauma.  LTD-046.  Dr.

17   Taggart observed that the area was red and inflamed.  *Id*.  She referred Mr. Bunger for vascular

18   testing, which showed no thrombosis.  LTD-147-49.

19   Dr. Taggart completed a Unum Attending Physician Statement on June 9, 2014.  LTD-

20   045.  She stated that Mr. Bunger remained unable to work due to his condition.  She described

21   his treatment, which included antibiotics, IV therapy, Trazodone, Gabapentin, Metronidazole and

22   other medications.  *Id*.  Asked to describe Mr. Bunger's limitations and restrictions, she stated he

23   was "unable to focus at work" and was "unable to take care of children . . . due to symptoms."

24   She stated that he "needs to rest as much as possible."  *Id*.

25   When Dr. Taggart saw Mr. Bunger on June 11, 2014, she again noted tremors when

26   testing his strength.  STD-099.  His deep tendon reflexes were reduced to 1+4.  *Id*.; *see also*

27

---

[6] http://c.merriam-webster.com/medlineplus/clonus (last visited January 5, 2016).

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 7

NO. 2:15-cv-01050-RAJ

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1    STD-145.  (Deep tendon reflexes are "a brisk contraction of a muscle in response to a sudden

2    stretch induced by a sharp tap . . . on the tendon of insertion of the muscle.").[7]  Mr. Bunger

3    reported having "a couple of episodes of weakness where unable to stand" and "some episodes

4    of spaciness."  STD-099.  Although his sleep was improved, he was "groggy" for 1-2 hours each

5    morning.  Labs showed elevated eosinophils ("a white blood cell or other granulocyte with

6    cytoplasmic inclusions readily stained by eosin").[8]  *Id.*; *see also* STD-123, 127.  In addition to

7    CFS, Dr. Taggart diagnosed eosinophilia (an "abnormal increase in the number of eosinophils in

8    the blood that is characteristic of allergic states and various parasitic infection").[9]  STD-100.

9         On June 20, 2014, Unum employee Raisa Mironowski, RN, completed a "Clinical

10    Analysis" summarizing Mr. Bunger's condition from January 6, 2014 through June 9, 2014.  She

11    concluded that the "current clinical exam findings provided by Dr. Taggart and Dr. Lutack

12    supported "R & Ls [restrictions and limitations] of no work" from January 6, 2014 through April

13    15, 2014.  STD-082.  Ms. Mironowski noted Mr. Bunger's positive test for lyme disease,

14    insomnia, poor sleep, "chronic fatigue syndrome[,] brain fog, and anxiety condition."  *Id*.  On

15    June 25, 2014, Unum wrote Mr. Bunger that it deemed him disabled from February 17 through

16    March 16, 2014 "due to your recurrent condition."  STD-077.

17         On June 26, 2014, Unum asked Dr. Taggart for information regarding Mr. Bunger.  She

18    responded that he had "extreme fatigue, episodes of vertigo and weakness" and "should not be

19    working or exercising, or performing activities that cause exertion due to [the] nature of his

20    symptoms."  STD-097.  She stated that he "currently is unable to work, drive, exercise or take

21    care of his children because [of] his level of fatigue, weakness and episodes of vertigo."  *Id*.

22         Unum employee Kellie Hinson, RN, reviewed Mr. Bunger's medical records on July 8,

23    2014.  STD-144-45.  She concluded that given his "recurrent and worsening symptoms of

24    chronic fatigue syndrome, autonomic dysfunction and peripheral neuropathy related to Lyme's

25    disease and ongoing treatment" the restrictions and limitations Dr. Taggart described were

26

27

---

[7] Mosby's Medical Dictionary, 9th edition (2009).
[8] http://c.merriam-webster.com/medlineplus/eosinophil (last visited January 5, 2016).
[9] http://c.merriam-webster.com/medlineplus/eosinophilia (last visited January 5, 2016).

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 8

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1    "reasonable." STD-145.  On July 9, 2014, Unum advised Mr. Bunger that his benefits were

2    approved through July 10, 2014.  STD-150.

3          Mr. Bunger saw Dr. Taggart on July 10, 2014.  STD-177.  She again observed that his

4    deep tendon reflexes were reduced, and that he had weakness with tremor in his hips, ankles

5    shoulders and grip.  She noted that he was "slow to respond at times."  Mr. Bunger described an

6    incident three days earlier in which he started feeling nauseous while driving, and then vomited

7    when he got home.  This episode was preceded by dizzy spells.  *Id.*

8          Unum reviewed Mr. Bunger's claim on July 24, 2014.  Its internal note states: "Clinical

9    review continues to support R&Ls, but feel clarification is needed."  STD-162.  The note

10   continues: "ICD9 should be updated to reflect lyme disease or chronic fatigue syndrome, as these

11   are the conditions repeatedly mentioned[.]"  *Id.*  Unum wrote Dr. Taggart on July 25, 2014,

12   asking her to provide that and other information regarding her patient.  LTD-172-74.

13         Dr. Taggart responded on July 30, 2014, answering Unum's specific questions.  LTD-

14   172-73.  Providing ICD-9 codes, she stated that Mr. Bunger's diagnoses were Chronic Fatigue

15   Syndrome, Peripheral Neuropathy, Dizziness/Vertigo, Chronic Tick Borne Infection and

16   Autonomic Dysregulation.  LTD-172.  Asked to list specific findings, Dr. Taggart stated,

17   "weakness and tremors in his lower extremities, dizziness and vertigo, confusion, severe fatigue,

18   anxiety and intermittent nausea."  *Id.*  Unum provided Mr. Bunger's job description, and asked

19   Dr. Taggart to state his current restrictions and limitations.  LTD-173.  She responded:

20           Patient should not and cannot drive to and from work.  He is unable to concentrate
             and focus for more than a few minutes at a time.  He needs to rest frequently.  He
21           has difficulty organizing thoughts, reading for any length of time and would not
             be able to perform any of his work tasks proficiently at this time.
22
     *Id.*
23
           Dr. Taggart saw Mr. Bunger on July 31, 2014.  LTD-175.  His symptoms had worsened.
24
     *Id.*  He was using a cane, due to weakness and being unsteady on his feet.  *Id.*  He was "in bed a
25
     lot."  He had difficulty falling asleep, often not able to do so until 1:00 to 3:00 a.m., after which
26
     he then slept deeply for ten hours.  He had a rash on his arms, chest, back and legs for three to
27

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52  Page 9

NO. 2:15-cv-01050-RAJ

LAW OFFICE OF MEL CRAWFORD
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

four weeks; Dr. Taggart observed red bumps, one with broken skin.  Mr. Bunger was unable to help with his children, or with cleaning or cooking.  He was "very cranky."  *Id*.

Unum's Nurse Hinson spoke with Dr. Taggart on August 14, 2014.  STD-243.  Ms. Hinson summarized their conversation regarding Mr. Bunger:

> . . . his major issues are inability to focus and weakness; he has a lot of default [sic] in focusing while in the office and uses a cane for support when walking.  He is also struggling with associated anxiety and has begun seeing a therapist, she thinks at least 1-2 times monthly.  He has not been referred to PT but will consider once he gets to that position.

*Id*.  She concluded that "given this information . . . [it] would be reasonable to support up to 1 month beyond 7/31/14[.]"  *Id*.  Unum then wrote Mr. Bunger that his disability benefits were approved through August 29, 2014.  STD-250.

### E.  Unum Considers Mr. Bunger's Claim Progressing to Long-Term Disability, Then Terminates His Short-Term Disability Benefits and Denies LTD.

On August 15, 2014, Unum advised Mr. Bunger that he was "approaching a point where Short Term Disability Benefits will end and your claim will be considered under the Long Term Disability plan."  STD-250.  On August 29, 2014, Unum's LTD group wrote Dr. Taggart and requested her records since January 1, 2014.  LTD-282.  She responded on September 9, 2014, with a 25-page fax.  LTD-285-309.  Although Dr. Taggart transmitted those records on September 9, UNUM wrote her on September 22, 2014 stating it was "missing" the record of Mr. Bunger's September 10, 2014 office visit.  LTD-319.

Dr. Taggart responded on September 29, 2014, sending the September 10, 2014 office visit note and a detailed letter regarding Mr. Bunger's condition.  LTD-333-36.  After describing the course of his illness through his February 22, 2014 hospital visit, she wrote:

> Unfortunately, his symptoms continued to worsen over the following months to the point where he had severe weakness in both legs and required a cane to walk. He continued to be very fatigued, often experiencing dizziness and cognitive impairment. He also experienced myalgia and arthralgia, autonomic dysfunction (including sweating, sleep disturbances, and anxiety), phlebitis in his upper extremities, nausea, dermatitis, and tremors/convulsions.

LAW OFFICE OF MEL CRAWFORD
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

Physical exam findings have shown weakness in his lower extremities, intention tremors in the lower extremities, hyperreflexia with clonus, hyporeflexia more recently with fasciculations. His skin is often clammy, and at times he has had inflammation around his eyes. The superficial veins in his upper extremity are often tender with palpation (thrombosis has been ruled out), and his hands at times have been very erythematous in his fingers and palms. He has lymphadenopathy (predominantly cervical), and at times has a mildly elevated temperature. On occasion he has had low back pain with palpation.  . . .

Laboratory testing has been positive for heterozygous mutations in his MTHFR gene. He also had a positive IgM Western Blot for Lyme disease. Extensive autoimmune testing has been negative thus far, and basic labs have essentially been normal.

I have been treating Mr. Bunger with an antibiotic protocol targeting the Lyme disease and a number of therapies to support detoxification and reduce inflammation. My last visit with Mr. Bunger was on 9/10/14. Mr. Bunger reported some mild improvement at this visit with these therapies. He was no longer using a cane and reported that his energy had been better and anxiety reduced. Weakness in his legs was still present although improved. His reflexes were also mildly improved with less fasciculations in the lower extremity. He had reported an episode that occurred during the previous week during which he had a "convulsion" while lying on the couch. His body spasmed/jerked multiple times and then he had dulled sensations throughout his entire body for a few hours following this.

Currently, Mr. Bunger's symptoms prevent him from doing many activities of daily living including cooking, cleaning, caring for his 2 children, and driving. He is also still unable to work due to the nature of his symptoms. He fatigues easily and still has cognitive impairments that prevent him from being able to perform his job functions. He is also unable to drive to and from work due to these cognitive impairments and the dizziness that he experiences at times. Although Mr. Bunger showed and reported improvement at his last visit, his symptoms are cyclical and he continues to report episodes of cognitive impairment and fatigue that will last for several hours and sometimes days. His wife has accompanied him to most of his visits and has confirmed these symptoms.

I have discussed with Mr. Bunger seeing a neurologist, however we have decided that because he is improving with the Lyme disease treatment, and the neurology consult at the ER was normal, we will wait to do that for now. We have also decided not to consult with and Infectious Disease Specialist as Lyme Disease treatment is an area I have studied extensively and treat routinely.

LTD-333-34.

Law Office of Mel Crawford
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1    Despite Dr. Taggart's September 29, 2014 fax transmission of her September 10, 2014

2    chart note – and her letter summarizing Mr. Bunger's care through that date – Unum's STD Unit

3    wrote Mr. Bunger on October 13, 2014, stating: "On September 09, 2014, we received medical

4    information from Dr. Taggart however the records were outdated. Since we did not receive the

5    requested information, we are closing your claim." STD-304.

6    Unum's Long-Term Disability Unit joined in this confusion regarding a purported lack of

7    records.  Its internal note of October 13, 2014, states: "[m]ultiple requests have resulted in only

8    old records being received.  Agree with adverse decision at this time as a result." STD-311.

9    On October 31, 2014, Unum's in-house doctor, Todd Lyon, M.D., issued a report stating

10   Mr. Bunger's restrictions and limitations were not "medically supported." LTD-359-60.  He

11   stated that Mr. Bunger did not have lyme disease, and likely had a false positive test for that

12   illness.  LTD-359.  He called Dr. Taggart soliciting her response.  Dr. Taggart wrote Unum on

13   November 4, 2014.  She described Mr. Bunger's symptoms, and then stated:

> Based on these findings and the findings over the past 9 months, I believe Mr.
> Bunger meets the diagnostic criteria for chronic fatigue syndrome.
>
> . . . I noted a very sudden change in Mr. Bunger's cognitive abilities, ability to
> engage with others around him, irritability, level of fatigue, and onset of
> peripheral neuropathy in January 2014. His wife reported that he became
> disengaged, unable to help with the kids or around the house, very fatigued, and
> had a very difficult time with his short-term memory. This information is relevant
> to his case given that there is little in the way of physical exam findings and
> laboratory studies as is often the case in chronic fatigue syndrome. Given the
> diagnosis of chronic fatigue syndrome, Mr. Bunger is unable to work at this time
> even primarily seated.

LTD-374-75.

Dr. Lyon received Dr. Taggart's letter, and wrote an addendum to his report on

November 10, 2014.  He specifically addressed chronic fatigue syndrome – and rejected that

diagnosis, stating it "cannot co-exist" with chronic lyme disease "because CFS is a diagnosis of

exclusion."  LTD-382.  Dr. Lyon's addendum, like his report, stated that Mr. Bunger did not

have lyme disease.  *Id.*

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52  Page 12

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1    On November 12, 2014, Unum called Mr. Bunger, told him its medical review was

2    complete, and that "all records rveiews [sic] including labs, did not meet dx criteria for lyme

3    disease." LTD-395.  On November 17, 2014, Unum wrote Mr. Bunger and told him it had

4    terminated his benefits.  STD-339-42.  The letter stated that although Dr. Taggart "continued to

5    provide an opinion that you were unable to work due to fatigue related to your condition of lyme

6    disease," in Unum's view "a diagnosis of lyme disease had not been established by the CDC

7    (Center [sic] for Disease Control) criteria."  STD-339.

8    As is apparent from the preceding, Dr. Taggart also had diagnosed Chronic Fatigue

9    Syndrome.  *See* her notes dated January 10, 2014 (LTD-070-71); February 11, 2014 (LTD-068-

10   69); February 25, 2014 (LTD-066-67); March 4, 2014 (LTD-064-65-13); March 12, 2014 (LTD-

11   062-63); March 24, 2014 (LTD-060-61); March 31, 2014 (LTD-058-59); April 7, 2014 (LTD-

12   056-57); April 15, 2014 (LTD-054-55); April 22, 2104 (LTD-052-53); April 29, 2014 (LTD-

13   050-51); May 9, 2014 (LTD-048-49); May 15, 2014 (LTD-046-47); June 11, 2014 (STD-099-

14   100); July 10, 2014 (LTD-177-78); July 31, 2014 (LTD-175-76); and September 10, 2014 (LTD-

15   335-36).  She also noted the diagnosis in papers dated February 7, 2014 (STD-049); June 9, 2014

16   (LTD-045); July 30, 2014 (STD-172-73); and November 4, 2014 (LTD-374-75).

17   Unum's November 17, 2014 letter terminating Mr. Bunger's benefits did not mention

18   Chronic Fatigue Syndrome.  STD-339-342.

19   **F.  Mr. Bunger Appeals Unum's Benefit Termination.**

20   Without benefit of an attorney, Mr. Bunger appealed the benefit termination.  Told that

21   his claim was denied because "a diagnosis of lyme disease had not been established" in

22   accordance with criteria published by the Centers for Disease Control (STD-339), Mr. Bunger

23   addressed that issue in a two-page letter citing the CDC criteria for lyme disease.  LTD-407-08.

24   He concluded, "If there are other reasons that have not been provided to me for why my claim

25   was denied, I would like the opportunity to address those as well."  LTD-408.

26   Unum did not advise Mr. Bunger of any other reasons for denial of his claim.  It did not

27   tell him it considered and rejected his Chronic Fatigue Syndrome diagnosis.

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 13

LAW OFFICE OF MEL CRAWFORD
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1

**G.  Unum Denies Mr. Bunger's Appeal.**

2      Unum received Mr. Bunger's appeal, and noted that it "focused on CDC criteria."  LTD-

3   466.  It then proceeded to evaluate and reject his other diagnoses, including Chronic Fatigue

4   Syndrome.  With respect to CFS, Unum's in-house reviewer stated there was "no serologic,

5   metabolic, endocrine, infectious or hematologic support" for the diagnosis.  LTD-471.

6      Unum denied Mr. Bunger's appeal.  LTD-480-86.  It told him he never had been

7   disabled: "When considering all your symptoms/conditions, both individually and combined, our

8   Appeals physician concluded that the medical records do not support impairment as of January

9   14, 2014."  LTD-483.  It recited its reviewer's opinion that there was "no serologic, metabolic,

10   endocrine, infectious or hematologic support" for Mr. Bunger's CFS diagnosis.  LTD-482-83.

11      Mr. Bunger's administrative remedies exhausted, he filed this civil action.  Dkt. No. 1.

12                    **III.  LEGAL AUTHORITY AND ARGUMENT**

13   **A.  This Matter May Be Decided Under Rule 52.**

14      When an ERISA case is subject to *de novo* review, a motion under Rule 52 based on the

15   administrative record, rather than summary judgment, provides a means for disposition.  As this

16   court stated in *Bigham v. Liberty Life Assurance Co. of Boston*:

17
18
> This procedure is outlined in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (noting that "the district court may try the case on the record that the administrator had before it"). In a trial on the administrative record:

19
20
21
22
>> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

23
24
> *Id*. Thus, when applying the de novo standard in an ERISA benefits case, a trial on the administrative record, which permits the court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute.

25   *Id*., -- F.Supp.3d --, 2015 WL 8489417, at *2 (W.D. Wash. 2015); *see also Anderson v. Liberty*

26   *Mut. Long Term Disability Plan.*, -- F.Supp.3d --, 2015 WL 4523452 at *2 (W.D. Wash. 2015);

27   *Pannebecker v. Liberty Life Assur. Co. of Boston,* 542 F.3d 1213, 1217 n.1 (9th Cir. 2008).

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 14

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1        **B.  Unum's Benefit Denial is Reviewed *De Novo* and is Entitled to No Deference.**

2        ERISA benefit determinations are reviewed *de novo* "unless the benefit plan gives the

3    administrator or fiduciary discretionary authority to determine eligibility for benefits or to

4    construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

5    (1989).  Unum alleges as its Tenth Affirmative Defense: "In making any benefits determination,

6    Unum maintained discretionary authority both to determine eligibility for benefits and to

7    construe and interpret the terms of the Policies and the Plan.  Defendant did not abuse its

8    discretion[.]"  Dkt. No. 6 at 9:17-20.  It asserts this defense in reliance on a clause in its LTD

9    policy stating, "Unum has discretionary authority to determine your eligibility for benefits and to

10   interpret the terms and provisions of the policy."  LTD-424.

11       Washington prohibits such discretionary clauses.  WAC § 284–96–012(1).  Once a plan's

12   discretionary clause is invalidated by WAC 284–96–012, the standard of review returns to *de*

13   *novo*.  *Mirick v. Prudential Ins. Co. of Am*., 100 F. Supp. 3d 1094, 1097 (W.D. Wash. 2015);

14   *Landree v. Prudential Ins. Co. of Am.*, 833 F.Supp.2d 1266, 1273-74 (W.D. Wash. 2011).

15   Review here is thus under the *de novo* standard.

16       Under *de novo* review, an ERISA insurer's decision receives no deference.  *Muniz v.*

17   *Amec Construction Management, Inc.*, 623 F.3d 1290, 1295–1296 (9th Cir. 2010).  Instead, the

18   court performs an "independent and thorough inspection" of the matter.  *Silver v. Executive Car*

19   *Leasing Long–Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).  An ERISA plaintiff has

20   the burden to show disability by a preponderance of the evidence.  *Muniz,* 623 F.3d at 1294.

21       **C.  Mr. Bunger is Disabled Within the Meaning of the STD and LTD Plans.**

22       As set forth above in Section II.A, a person is "disabled" under the STD and LTD Plans

23   if "limited from performing the material and substantial duties of your own job . . . due to your

24   sickness[.]"  STD-367; LTD-428.

25       The preponderance of the evidence – the medical records and statements from the doctors

26   who actually encountered and evaluated Mr. Bunger in person, and Mr. Bunger's own statements

27   – is that Mr. Bunger was limited from performing the material and substantial duties of his job

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 15

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1   due to sickness.  It is, to use Unum's word, "reasonable" that a person beset with overwhelming

2   fatigue would be unable to work eight hours a day, five days a week.  *See* LTD-095 (Unum

3   stating it was "reasonable" that Mr. Bunger was unable to work from January 6 to April 15,

4   2014); LTD-168 ("reasonable" that he was unable to work from May 9 through July 11, 2014);

5   LTD-244 ("reasonable" that he was unable to work through the end of August 2014).  That is

6   particularly true given the demands of his work – ensuring the accuracy of a large business

7   website, coordinating and implementing changes to the website's content, executing campaigns

8   and promotions, whilst applying "excellent written and verbal communication skills" and "strong

9   organizational and analytical skills and attention to detail."  LTD-368-370.

10          Dr. Taggart stated that, due to his fatigue, Mr. Bunger had difficulty concentrating and

11  focusing, needed to rest frequently, and difficulty reading for any length of time.  STD-173.

12  Such symptoms would reasonably limit a person from performing the precise work expected of

13  Mr. Bunger, and from performing or directing multiple tasks simultaneously, working

14  cooperatively with others, giving training or instruction, maintaining composure under all

15  circumstances, and making independent judgments about matters of consequence.  Those, too,

16  are the requirements of Mr. Bunger's job. LTD-370.

17          No treating doctor suggested Mr. Bunger's symptoms were overstated or that he was not

18  credible.  Mr. Bunger's wife came to most appointments, and confirmed his symptoms.  STD-

19  324.  The only doctors who doubted Mr. Bunger's symptoms never met him.  As in *Salomaa v.*

20  *Honda Long Term Disability Plan*, a case also involving chronic fatigue syndrome, the

21  physicians who personally examined the plaintiff –

22          concluded, often in dramatic language, that Salomaa was totally disabled by his
23          physical condition.  Not a single physician who actually examined Salomaa
            concluded otherwise. The only documents with an "M.D." on the signature line
24          concluding that he was not disabled were by the physicians the insurance
            company paid to review his file. They never saw Salomaa.
25  642 F.3d 666, 676 (9th Cir. 2011).

26

27

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52  Page 16

NO. 2:15-cv-01050-RAJ

1  Unum may claim its in-house doctors trump Drs. Taggart and Lutack because the latter

2  have N.D., rather than M.D., degrees.  But Unum defines "physician" as –

3  a person performing tasks that are within the limits of his or her medical license; and

4  a person who is licensed to practice medicine and prescribe and administer drugs or
   to perform surgery; or . . .

5

6  a person who is a legally qualified medical practitioner according to the laws and
   regulations of the governing jurisdiction.

7  LTD-448, STD-376.  That definition encompasses N.D.s.  *See* RCW 18.36A.010 *et seq.*  Nor can

8  Unum claim naturopathic physicians are unqualified to assess whether sickness disables a person

9  when – four times – it relied upon Dr. Taggart's statements and records to find Mr. Bunger

10  disabled.

11  The STD and LTD Plans require a person to have a "sickness."   They do not require a

12  person to have a specific and unvarying diagnosis.  The "diagnostic process with respect to

13  chronic fatigue syndrome can evolve over time[.]"  *Kuhn v. Prudential Ins. Co. of Am.*, 551 F.

14  Supp. 2d 413, 427 (E.D. Pa. 2008).  The salient point is not how or whether Mr. Bunger's

15  diagnosis evolved, but whether he had a "sickness."

16  Mr. Bunger, his doctors, and Unum all agreed that his sickness disabled him from

17  January 14 through August 29, 2014.  There was no substantial improvement in his health on

18  August 30, 2014.  The preponderance of the evidence is that his sickness continued to limit his

19  ability to perform the material and substantial duties of his job after that date.  Unum's claim to

20  the contrary is incorrect and illogical.

21  **D.  If Unum Had Any Discretionary Authority, It Abused It.**

22  Unum's claim that this matter is subject to review for abuse of discretion is at odds with

23  WAC § 284–96–012 and cases from this Court applying that regulation.  Assuming, *arguendo*,

24  that Unum has the discretionary authority the regulation forbids, its termination of Mr. Bunger's

25  benefits merits no deference because it abused any discretion it had.  Several factors inform that

26  analysis.  First, any conflict of interest must be considered.  *Firestone*, 489 U.S. at 115.

27  Conflicts, however, "are but one factor among many that a reviewing judge must take into

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 17

LAW OFFICE OF MEL CRAWFORD
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1  account." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008).  "[N]umerous case-

2  specific factors" are considered in assessing abuse of discretion, including "the quality and

3  quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-

4  person medical evaluation or relied instead on a paper review of the claimant's existing medical

5  records[.]" *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009).  Other

6  factors include whether the administrator provided inconsistent reasons for denial, or failed to

7  credit a claimant's reliable evidence.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968

8  (9th Cir. 2006).  Procedural errors by the administrator are also "weighed in deciding whether

9  the administrator's decision was an abuse of discretion."  *Id*. at 972.

10  **1.  Unum Has a Structural Conflict of Interest.**

11  When an insurance company "both determines whether an employee is eligible for

12  benefits and pays benefits out of its own pocket," that "dual role creates a conflict of interest[.]"

13  *Glenn*, 554 U.S. at 108.  The insurer "has an incentive to pay as little in benefits as possible to

14  plan participants because the less money the insurer pays out, the more money it retains in its

15  own coffers." *Abatie*, 458 F.3d at 966.  Its "role as a fiduciary role lies in conflict with its role as

16  a profitmaking entity."  *Id*.

17  A court "must judge the reasonableness of the plan administrator skeptically" when such

18  a conflict exists.  *Salomaa*, 642 F.3d at 675.   "The conflict of interest requires additional

19  skepticism because the plan acts as judge in its own cause."  *Id*.  Here, as decision-maker and

20  payor of benefits, Unum undeniably has a "structural conflict of interest." *Abatie*, 458 F.3d at

21  965.  The reasonableness of its conduct thus warrants skepticism.

22  **2.  Unum Terminated Benefits Despite No Improvement in Mr. Bunger's Health.**

23  An insurer's determination that a person is no longer disabled, without corresponding

24  change in his health, suggests illogic rather than reasonableness.  *See Saffon v. Wells Fargo &*

25  *Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008) (insurer "had been paying

26  Saffon long-term disability benefits for a year, which suggests that she was already disabled. In

27  order to find her no longer disabled, one would expect the MRIs to show an *improvement*, not a

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 18

NO. 2:15-cv-01050-RAJ

1   lack of degeneration."); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)

2   ("unless information available to an insurer alters in some significant way, the previous payment

3   of benefits . . . must weigh against the propriety of an insurer's decision to discontinue those

4   payments."); *Bertelsen v. Hartford Life Ins. Co.*, 1 F.Supp.3d 1060, 1073 (E.D. Cal. 2014)

5   (insurer did not identify "any medical evidence suggesting that Plaintiff had improved" and "did

6   not explain why the medical findings that caused her to be disabled in 2008 were no longer

7   sufficient."); *Hertz v. Hartford Life & Acc. Ins. Co.*, 991 F. Supp. 2d 1121, 1141 (D. Nev. 2014).

8       *Peterson v. AT & T Umbrella Ben. Plan No. 1* addressed similar facts.  The court, in a

9   portion of its Order captioned "**It Was Illogical to Terminate Benefits Where the Only Doctor**

10  **Who Treated Plaintiff's Chronic Fatigue Syndrome, Which was the Basis for the Initial**

11  **Determination, Documented that Plaintiff's Symptoms Remained Unchanged**," stated:

12      To the extent the updated medical records document essentially the same
        disabling symptoms that the Plan previously found to be disabling, the Plan's
13      termination of Plaintiff's benefits was illogical and, in combination with the
        additional considerations discussed below, supports a finding of clear error.
14

15  *Id.*, No. C-10-03097JCS, 2011 WL 5882877, at *24-25 (N.D. Cal. Nov. 23, 2011) (unpublished).

16  As in *Peterson*, it was illogical to terminate Mr. Bunger's benefits when Dr. Taggart, the only

17  doctor who treated his CFS, which was the basis for Unum's determination that he was disabled,

18  documented that Mr. Bunger's symptoms remained unchanged.

19      **3.   Unum Impermissibly Required Objective Proof of Chronic Fatigue Syndrome.**

20      "There is no blood test or other objective laboratory test for chronic fatigue syndrome."

21  *Salomaa*, 642 F.3d at 677.   Accordingly, it is "illogical" to deny a disability claim based on CFS

22  because of a lack of objective measures.  *Id.*  "[C]onditioning an award on the existence of

23  evidence that cannot exist is arbitrary and capricious."  *Id.* at 678.  *See also Eisner v. The*

24  *Prudential Ins. Co. of Am.*, 10 F.Supp.3d 1104, 1114 (N.D. Cal. 2014) (abuse of discretion for an

25  ERISA disability insurer to rely "on normal diagnostic or clinical results in the face of credible

26  evidence suggesting impairment due to . . . chronic fatigue."); *Cook v. Liberty Life Assurance*

27  *Co.,* 320 F.3d 11, 21 (1st Cir. 2003)  ("it was not reasonable . . . to expect [the insured] to

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 19

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1   provide convincing 'clinical objective' evidence that she was suffering from CFS"); *Vega v.*

2   *Comm. of Social Security,* 265 F.3d 1214, 1219 (11th Cir. 2001) ("there are no specific

3   laboratory findings that are widely accepted as being associated with CFS.").

4       Unum's assertion that there was "no serologic, metabolic, endocrine, infectious or

5   hematologic support" for Mr. Bunger's CFS diagnosis mirrors the reasons offered by the insurer

6   in *Salomaa*, which emphasized the lack of "positive physical findings" and that "thyroid,

7   calcium, albumin serum electrolytes and CBC results" were normal.  642 F.3d. at 676-77.

8   "These reasons are illogical, because objective measures such as blood tests are used to rule out

9   alternative diseases, not to establish the existence of chronic fatigue syndrome."  *Id*. at 677.

10       **4.   The Plans Do Not Require Objective Evidence of Sickness.**

11       An insurer may draft a disability insurance policy to exclude conditions based on self-

12   reported symptoms, or to limit the time it pays benefits for such conditions.  When insurers write

13   policies *without* such terms, they take on the attendant risks:

14           Absence of objective proof through x-rays or blood tests of the existence or
    nonexistence of the disease creates a risk of false claims. Claimants have an

15   incentive to claim symptoms of a disease they do not have in order to obtain
    undeserved disability benefits.  But the claimants are not the only ones with an

16   incentive to cheat.  The plan with a conflict of interests also has a financial
    incentive to cheat. Failing to pay out money owed based on a false statement of

17   reasons for denying is cheating, every bit as much as making a false claim. The
    plan has no exception to coverage for chronic fatigue syndrome, so CIGNA has

18   taken on the risk of false claims for this difficult to diagnose condition.

19   *Salomaa*, 642 F.3d at 678.  *See also Hertz*, *supra*, 991 F. Supp. 2d at 1139 (where plan had "no

20   explicit, or even implicit requirement" for "objective proof" of disability, insurer wrongly denied

21   benefits based on its "assessment that there was only minimal objective evidence" to support the

22   claimant's subjective symptoms.)

23       The STD and LTD Plans at issue here do not exclude coverage for conditions diagnosed

24   primarily by self-reported conditions, or require objective evidence to demonstrate disability.

25   Nor do they require proof of the etiology of one's sickness.  *See Kuhn v. Prudential Ins. Co. of*

26   *Am.*, 551 F. Supp. 2d 413, 428 (E.D. Pa. 2008) ("arbitrary and capricious" to "require clinical

27   evidence of the etiology of . . . chronic fatigue syndrome" because that sickness "does not have a

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 20

NO. 2:15-cv-01050-RAJ

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

known etiology." Yet Unum told Mr. Bunger when denying his appeal: "There has been no underlying etiology identified for your reports of fatigue." LTD-483.

### 5. Unum Discounted or Disbelieved Mr. Bunger's Subjective Reports.

"Vertigo, fatigue, and nausea are subjective experiences that cannot be easily measured by an objective standard, but that does not mean such symptoms should be discounted or disbelieved." *Anderson, supra,* -- F. Supp. 3d --, 2015 WL 4523452, at *8, citing *Salomaa*, 642 F.3d at 678 and *Saffon,* 522 F.3d at 872–73. "Subjective complaints of disabling conditions are not merely evidence of a disability, but are an important factor to be considered in determining disability." *Anderson* at *8, quoting *Miles v. Principal Life Ins. Co*., 720 F.3d 472, 486 (2d Cir. 2013).

In order to find Mr. Bunger no longer disabled by the fatigue it earlier found disabling, Unum necessarily had to discount or disbelieve his symptoms. It did so without rational basis.

### 6. Unum Impermissibly Discounted the Opinions of the Treating Doctors.

It is an abuse of discretion for an ERISA insurer to arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). "Many medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established[.]" *Salomaa*, 642 F.3d at 678. One cannot discount the opinions of treating physicians "because they considered [the patient's] subjective complaints." *Perryman v. Provident Life & Accident Ins. Co*., 690 F. Supp. 917, 945 (D. Ariz. 2010). "They necessarily had to do so in reaching their conclusions regarding the nature and extent of [the patient's] impairments because it is both medically and legally accepted that CFS is largely a self-reported illness that cannot be diagnosed through any objective medical test." *Id*., citing *Reddick v. Chater,* 157 F.3d 715, 726 (9th Cir. 1998) (fatigue underlying CFS "is necessarily self-reported") and *Friedrich v. Intel Corp.,* 181 F.3d 1105, 1112 (9th Cir. 1999) (CFS has no "generally accepted 'dipstick' test.").

In *Perryman*, the court observed that although the plaintiff's "treating physicians generally do not explain how the results of their clinical testing support their conclusions that

LAW OFFICE OF MEL CRAWFORD
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.694-1614  Fax 206.905-2342

1   [she was] unable to work," their "subjective judgments . . . formed from their overall experiences

2   with her must be considered in evaluating their opinions of the extent and effect of her

3   impairments." 690 F. Supp.2d at 946, citing *Embrey v. Bowen,* 849 F.2d 418, 422 (9th Cir. 1988)

4   ("The subjective judgments of treating physicians are important, and properly play a role in their

5   medical evaluations.").  If an insurer rejects a treating physician's opinions, it should do so

6   because it is crediting "reliable evidence that conflicts with a treating physician's evaluation."

7   *James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 874 (N.D. Cal. 2014),

8   citing *Farhat v. Hartford Life & Acc. Ins. Co.*, 439 F.Supp.2d 957, 973 (N.D.Cal. 2006) (plan

9   administrator abused its discretion where it "did not rely on other contradictory evidence," but

10  "simply dismissed" a treating physician's "opinion as insufficient based on the absence of

11  supporting medical evidence.").

12      Unum, without itself having examined Mr. Bunger, rejected Dr. Taggart's belief that

13  chronic fatigue disabled him.  It did so without identifying reliable evidence that suggested Mr.

14  Bunger was not disabled.  That, too, is an abuse of any discretion it had.

15          **7.   Unum Relied Upon a "Pure Paper" Review.**

16      An insurer's use of a "pure paper" review "raise[s] questions about the thoroughness and

17  accuracy of the benefits determination." *Montour*, 588 F.3d at 634.  That is because an

18  "insurance company may choose to avoid an independent medical examination because of the

19  risk that the physicians it employs may conclude that the claimant is entitled to benefits."

20  *Salomaa,* 642 F.3d at 676.  *See also*, *e.g. Hertz*, 991 F. Supp. 2d at 1141-42 (insurer's failure to

21  conduct an IME "weighs strongly in favor of finding that it abused its discretion"); *Eisner*,

22  *supra*, 10 F.Supp.3d at 1115 ("courts routinely weigh" IME reports "more heavily than they do

23  reports and file reviews from paid consultants who never examine the claimant[.]").

24      Unum had the right to subject Mr. Bunger to in-person medical evaluations.  LTD-428.  It

25  chose instead to rely on paper reviews by consultants who never met him.  It is "probably . . .

26  unreasonable" for an insurer to rely on the opinions of a paper-reviewing consultant to reject a

27  claimant's subjective reports.  *Montour*, 588 F.3d at 635.

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 22

NO. 2:15-cv-01050-RAJ

1

### 8.  Unum's Reviewers Were Not Truly Independent.

2

To show its conflict played no role, a conflicted administrator may want to "demonstrate

3

that it used truly independent medical examiners." *Abatie*, 458 F.3d at 969, n.7.  If an

4

administrator fails to do so, its denial should be viewed with "high skepticism."  *Oster v.*

5

*Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1186 (N.D. Cal. 2011).  Here, Unum relied upon its

6

own employee physicians to determine whether Mr. Bunger was disabled, and to determine

7

whether its own decisions were correct.  That falls short of using "truly independent" reviewers.

8

### 9.  Unum's Benefit Termination Failed to Comply With ERISA Regulations.

9

When an ERISA insurer denies a claim for benefits, it must provide "[a] description of

10

any additional material or information necessary for the claimant to perfect the claim and an

11

explanation of why such material or information is necessary." 29 C.F.R. § 2560.503–1(g)(iii).

12

As the Ninth Circuit explained:

13

14

15

16

17

> In simple English, what this regulation calls for is a meaningful dialogue between
> ERISA plan administrators and their beneficiaries. If benefits are denied in whole
> or in part, the reason for the denial must be stated in reasonably clear language,
> with specific reference to the plan provisions that form the basis for the denial; if
> the plan administrators believe that more information is needed to make a
> reasoned decision, they must ask for it. There is nothing extraordinary about this;
> it's how civilized people communicate with each other regarding important
> matters.

18

*Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).  In *Saffon*, the Ninth

19

Circuit found the benefit termination letter "uninformative."  522 F.3d at 870.  It explained:

20

21

22

23

> It notes merely that "[t]he medical information provided no longer provides
> evidence of disability that would prevent you from performing your job or
> occupation," but does not explain why that is the case, and certainly does not
> engage [the treating physician's] contrary assertion. The termination letter does
> suggest that Saffon can appeal by providing "objective medical evidence to
> support [her] inability to perform the duties of [her] occupation," but does not
> explain why the information Saffon has already provided is insufficient for that
> purpose.

24

*Id. See also Salomaa*, 642 F.3d at 679-680.

25

"When an administrator tacks on a new reason for denying benefits in a final decision,

26

thereby precluding the plan participant from responding to that rationale for denial at the

27

administrative level, the administrator violates ERISA's procedures."  *Abatie*, 458 F.3d at 974.

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 23

LAW OFFICE OF MEL CRAWFORD
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1    "Accordingly, an administrator that adds, in its final decision, a new reason for denial, a

2    maneuver that has the effect of insulating the rationale from review, contravenes the purpose of

3    ERISA." *Id*.

4        Unum violated both principles.  Its letter terminating Mr. Bunger's benefits failed to

5    advise what information he should submit, and failed to mention Mr. Bunger's CFS diagnosis at

6    all.  STD-339-42.  Only in its final letter denying Mr. Bunger's appeal did Unum address that

7    diagnosis.  LTD-482-83.  Mr. Bunger thus had no opportunity to address Unum's rationale for

8    rejecting CFS – its claim that he presented "no serologic, metabolic, endocrine, infectious or

9    hematological support" for that diagnosis, or its claim that he could not have CFS because it was

10   inconsistent with having lyme disease – a disease Unum denied he had.

11                                **IV. CONCLUSION**

12       This matter should be reviewed under the *de novo* standard.  The preponderance of the

13   evidence is that Mr. Bunger remained disabled after August 29, 2014.  Alternatively, Unum

14   abused any discretion it conceivably had when it terminated Mr. Bunger's STD benefits and

15   denied him LTD benefits.

16       Mr. Bunger respectfully moves the Court to enter judgment declaring him disabled under

17   the STD Plan from August 30 to October 4, 2014, and under the LTD Plan from October 5, 2014

18   to July 5, 2015.  Because Unum did not consider whether Mr. Bunger was disabled beyond July

19   5, 2015, when the disability definition changed to an "any occupation" standard, the claim

20   should be remanded to Unum to determine disability after that date.  S*affle v. Sierra Pacific*

21   *Power Co. Bargaining Unit LTD Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996); *Taylor v.*

22   *Reliance Standard Life Ins. Co.*, No. C10-1317, 2012 WL 113558 (W.D. Wash. Jan. 13, 2012).

23       RESPECTFULLY SUBMITTED this 26th day of January 2016.

24                                LAW OFFICE OF MEL CRAWFORD

25

26       By *s/Mel Crawford*
             Mel Crawford, WSBA # 22930
27           Attorney for Plaintiff
             melcrawford@melcrawfordlaw.com

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 24

**LAW OFFICE OF MEL CRAWFORD**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.694-1614  Fax 206.905-2342

1

<u>CERTIFICATE OF SERVICE</u>

2

I certify that on the date noted below I electronically filed this document entitled

3

Plaintiff's Motion for Judgment Under Rule 52 with the Clerk of the Court using the CM/ECF

4

system, which will send notification of such filing to the following persons:

5

<u>Attorneys for Defendants:</u>

6

D. Michael Reilly
Gabriel Baker

7

LANE POWELL, PC
1420 Fifth Ave, Ste 4100

8

Seattle, WA 98101-2338
Email:  reillym@lanepowell.com

9

bakerg@lanepowell.com

10

DATED this 26th day of January 2016 at Seattle, Washington.

11

12

13

s/*Mel Crawford*

14

Mel Crawford

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S MOTION FOR JUDGMENT
UNDER FED.R.CIV.PRO. 52   Page 25

NO. 2:15-cv-01050-RAJ