UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRIS BUNGER,

      Plaintiff,

      v.

UNUM LIFE INSURANCE COMPANY OF
AMERICA,

      Defendant.

Case No. 2:15-cv-01050-RAJ

ORDER DENYING PLAINTIFF'S AND
DEFENDANT'S CROSS MOTIONS FOR
JUDGMENT UNDER FRCP 52 AND
REMANDING TO THE
ADMINISTRATOR

## I.  INTRODUCTION

This matter comes before the Court on Cross Motions filed by Plaintiff Chris Bunger

and Defendant Unum Life Insurance Company of America, seeking a final judgment from this

Court under Federal Rule of Civil Procedure 52 based on an administrative record created in an

underlying Employee Retirement Income Security Act ("ERISA") dispute.  Dkt. ##13 and 14.

Plaintiff brings this action under ERISA, 29 U.S.C. § 1001 *et seq.* to recover short-term

disability benefits and long-term disability benefits under the Costco Employee Benefits

Program's – Voluntary Short Term Disability Plan and the Costco Employee Benefits

Program's – Long Term Disability Plan.  Mr. Bunger, who worked as a Web Content Specialist

for Costco Wholesale Corporation, argues that he is totally disabled under the terms of both

plans due to chronic fatigue syndrome, Lyme disease, or an unspecified illness which causes extreme fatigue and inability to concentrate.  Unum argues that Mr. Bunger has no properly diagnosed conditions, and has not shown that he is unable to perform his job functions.  For the reasons set forth below, the Court denies both motions and remands to Unum to further develop the record.

## II.  PROCEDURAL ISSUES

Before turning to the merits of the parties' arguments, the Court must determine whether it is appropriate to resolve this case on the parties' cross motions for judgment under Rule 52 (Dkt. ##13 and 14) as opposed to summary judgment under Rule 56.  The answer depends on what standard of review the court applies.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989) ("ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations.").  The parties here have simplified the matter by stipulating to *de novo* review.  Dkt. ##13 at 15; 14 at 9.  The Court accepts the parties' stipulation and reviews the record *de novo*.  *See Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009) (unpublished) (court may accept parties' stipulation to *de novo* review).

Where review is under the *de novo* standard, the Ninth Circuit has not definitively stated the appropriate vehicle for resolution of an ERISA benefits claim.  The *de novo* standard requires the court to make findings of fact and weigh the evidence.  *See Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (*de novo* review applies to plan administrator's factual findings as well as plan interpretation).  Typically, a request to reach judgment prior to trial would be made under a Rule 56 motion for summary judgment, however under such a motion the court is forbidden to make factual findings or weigh

evidence. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Instead, the parties here propose the Court conduct a trial on the administrative record under Rule 52.

This procedure is outlined in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (noting that "the district court may try the case on the record that the administrator had before it"). In a trial on the administrative record:

> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

*Id.* Thus, when applying the *de novo* standard in an ERISA benefits case, a trial on the administrative record, which permits the court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute. *See Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (on *de novo* review of an ERISA benefits claim, the "appropriate proceeding[] . . . is a bench trial and not the disposition of a summary judgment motion"); *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1032 n.2 (N.D. Cal. 2011) ("*De novo* review on ERISA benefits claims is typically conducted as a bench trial under Rule 52"); *but see Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005) ("When there is no dispute over plan interpretation, the use of summary judgment . . . is proper regardless of whether our review of the ERISA decision maker's decision is de novo or deferential.").

Given the above law, and the clear intent of the parties, the Court elects to resolve the parties' dispute in a bench trial on the administrative record rather than on summary judgment. Therefore, the court issues the following findings and conclusions, pursuant to Rule 52.

ORDER DENYING PLAINTIFF'S AND DEFENDANT'S CROSS MOTIONS FOR JUDGMENT
UNDER FRCP 52 AND REMANDING TO THE ADMINISTRATOR - 3

### III. FINDINGS OF FACT

1. Plaintiff Chris Bunger began working for Costco Wholesale Corporation in 2000. LTD-5. In 2014, when Mr. Bunger became ill, he was working as a Web Content Specialist. LTD-368. This job required "[e]xcellent written and verbal communication skills, . . . [s]trong organizational and analytical skills, and attention to detail," as well as the ability to multi-task and perform a variety of complex tasks. LTD-368, 370.

2. Mr. Bunger was offered Short Term Disability ("STD") and Long Term Disability ("LTD") benefits through plans administered by Unum Life Insurance Company of America. STD-378; LTD-450.

3. Under the STD Plan, benefits are awarded if an employee is "limited from performing the material and substantial duties of [his] own job . . . due to . . . sickness or injury; and [he] ha[s] a 20% or more loss in weekly earnings." STD-367. These benefits are only available for a short term: 26 weeks. STD-371.

4. Under the LTD Plan, benefits are awarded beyond the 26-week window. LTD-434. For the first nine months of LTD coverage, "disabled" is defined in the same way for LTD benefits as it is for STD benefits. LTD-428. However, after nine months, an employee must show that he is disabled from "any gainful occupation" as opposed to just his "own job." *Id.*

5. On January 6, 2014, Mr. Bunger visited his primary care physician, Traci Taggart, N.D. LTD 72-74. Dr. Taggart is a naturopath. *Id.* At this visit, Mr. Bunger described an episode that occurred the previous Friday. LTD-74. While driving home from work, Mr. Bunger had started feeling lightheaded, cloudy, weak, and faint. *Id.* The feeling lasted for about one minute. *Id.* Mr. Bunger felt very anxious during the attack, but not

1
2
3
4
5
6

prior to it.  *Id.*  Mr. Bunger stated that he had experienced the same kind of attack earlier in the week, and then again the morning of his doctor's appointment.  *Id.*  Dr. Taggart diagnosed Mr. Bunger with anxiety, lightheadedness/vertigo, MTHFR gene mutation, and Raynaud's phenomenon.  LTD-73.  She ordered lab tests and instructed Mr. Bunger to take various supplements.  *Id.*

7
8
9
10
11
12
13
14

6.  On January 10, 2014, Mr. Bunger saw Dr. Taggart again.  LTD-70-71.  He stated that he felt fatigued and "out of it."  LTD-70.  His brain was having a hard time ordering his thoughts.  *Id.*  Earlier words did not sound like a sentence, and he was speaking very slowly, although his words were not slurred.  *Id.*  He had been unable to drive.  *Id.*  Dr. Taggart diagnosed Mr. Bunger with chronic fatigue syndrome, fatigue/malaise, and brain fog.  LTD-71.  She prescribed more supplements and an antibiotic.  *Id.*  She also ordered additional lab work.  *Id.*

15
16
17
18

7.  On January 28, 2014, Mr. Bunger filled out a request for intermittent personal medical leave, for the period of January 6, 2014 to May 6, 2014.  LTD-98.  Dr. Taggart filled out a certification to accompany this request.  LTD 99-102.

19
20
21
22
23

8.  On February 4, 2014, Dr. Taggart called Mr. Bunger with the results of his lab work. LTD-87.  While most of his labs were normal, one of the tests indicated that Mr. Bunger had Lyme disease.  LTD-82-88.  Dr. Taggart asked Mr. Bunger to come in to her office to discuss a treatment plan.  LTD-87.

24
25
26
27
28

9.  The same day, Mr. Bunger filed a short-term disability claim with Unum.  *See* STD-2. Unum then asked Dr. Taggart to fill out an "Attending Physician's Statement."  STD-50.  Dr. Taggart stated in the Attending Physician's Statement that Mr. Bunger was suffering from "severe fatigue, lightheadedness and inability to focus or concentrate.

These episodes make it impossible to drive and difficult to work." STD-49.   Dr. Taggart diagnosed Mr. Bunger with: (1) unspecified disorder of autonomic nervous system; (2) chronic fatigue syndrome; (3) attention or concentration deficit; and (4) arthropod-born disease, unspecified. *Id.*  On February 17, 2014, Unum approved Mr. Bunger's disability claim through January 26, since Mr. Bunger returned to work on January 27.  STD-56.

10. Mr. Bunger continued to see Dr. Taggart in February 2014 for dizziness, confusion, brain fog, fatigue, difficulty concentrating, out-of-body experiences, and weakness. LTD-66-69.  He also complained of pain in his lower back and hips.  LTD-66.  Mr. Bunger suffered an episode of dizziness on February 22 that was so severe he went to the emergency room.   LTD-293.   Several tests were conducted on Mr. Bunger, including an EKG, chest x-ray, and MRI.  LTD-295.  All of the tests came back normal. LTD-296-308.  Mr. Bunger was given an IV while at the hospital, and he felt better and was released.  *See* LTD-294-295.

11. On March 4, 2014, Mr. Bunger applied for STD benefits again.  STD 71-73.  Although he stated that his last day in the office was February 21, STD-72, his leave calendar indicates that he had been out since February 10, STD-419.  Mr. Bunger was entirely off work for five weeks, after which he began working part-time. *See id.*

12. Throughout March and April, Mr. Bunger continued to see Dr. Taggart, as well as her colleague, Dr. Lutack.  LTD-50-65.  In addition to his fatigue and dizziness symptoms, Mr. Bunger also complained of sleep disturbance, flu-like symptoms, and an inability to care for his kids.  *See id.*  By April, Mr. Bunger was working approximately 24 hours a week.  LTD-52.  Dr. Taggart continually diagnosed Mr. Bunger with some combination

of: chronic fatigue syndrome, brain fog, dizziness, vertigo, autonomic dysregulation, immune dysregulation, sleep disturbance, anxiety, weakness, and encephalopathy. *See* LTD-50-65. On April 22, she also noted hepatomegaly, clonus, Hoffmann's sign, swelling, and decreased deep tendon reflexes. LTD-52. She continued to prescribe antibiotics and supplements, but also prescribed trazodone for Mr. Bunger's sleep problems, and gabapentin for his neurological symptoms, as well as weekly IVs of nutrients. *See* LTD-50-65. She also suggested that Mr. Bunger see a therapist. LTD-59.

13. In May 2014, Mr. Bunger told Dr. Taggart that he was experiencing increased fatigue and weakness. *See* LTD-46-49. He said he was not able to care for his children, and he had to take frequent naps. LTD-48. At one point he was so weak he had to be helped in and out of bed. LTD-49. He had only been able to work two to three days per week. LTD-48. He also complained of nausea and a headache. LTD-48. Dr. Taggart noted that his deep tendon reflexes continued to be weakened, and he had fasciculations and tremors. LTD-46. One of the veins on his left wrist was also very red and tender. LTD-46. He had to discontinue an IV treatment when he began to feel very weak and clammy. LTD-48. Dr. Taggart continued to diagnose weakness, chronic fatigue syndrome, autonomic dysregulation, immune dysregulation, sleep disturbance, and anxiety, but also added diagnoses of vasculitis, peripheral neuropathy, and headache. LTD-47, 49.

14. Mr. Bunger once again requested medical leave however this time he requested continuous leave, instead of intermittent. STD-132. He requested leave from May 2, 2014 to August 2, 2014. *Id.* Dr. Taggart once again filled out a certification for this

request, as well as an Attending Physician's Statement for Mr. Bunger's pending disability claim.  STD 133-136; LTD-45.

15. On June 25, 2014, Unum approved Mr. Bunger's STD claim from February 17, 2014 to March 16, 2014.  STD-77.  However, an internal document shows that Unum had some concerns with the treatment Mr. Bunger was receiving.  *See* STD-82.  Raisa Mironowski, a Clinical Consultant, found that the homeopathic treatment Mr. Bunger received from January 6, 2014 to April 15, 2014 was reasonable, and the medical records from that time period supported Mr. Bunger's disability claim.  *Id.*  However, Ms. Mironowski thought that after the April 15, 2014 office visit, Dr. Taggart should have referred Mr. Bunger to several specialists, including an infectious disease specialist, a rheumatologist, and a behavioral health specialist.  *Id.*  Ms. Mironowski opined that it was not possible to determine if restrictions beyond April 15 were warranted without the opinion of these specialists.  *Id.*  However, it does not appear that Unum relayed these concerns to Mr. Bunger or Dr. Taggart.  Instead, Unum simply requested more records from Dr. Taggart, including any referrals that were made.  STD-88.

16. Dr. Taggart responded by sending her up-to-date medical records, including an office visit note from June 11, 2014.  STD 99-100.  At that visit, Mr. Bunger stated that he had some spaciness, but his fatigue was better, and he was more involved with his kids and was getting out of the house more.  STD-99.  He did have some pain in his veins, and some irritability while on antibiotics.  *Id.*  He was sleeping pretty well, although he was groggy for the first hour or two after waking up.  *Id.*  He had experienced a couple of episodes of weakness where he was unable to stand, and Dr. Taggart still noted

decreased deep tendon reflexes, weakness in the hips, and increased tremors.  *Id.*  Dr. Taggart also noted that he may have a parasite, based on his lab work.  STD-99-100.  In addition to antibiotics and trazodone, Dr. Taggart prescribed albendazole, an anti-parasite drug.  STD-100.

17. After reviewing the updated records, another clinical consultant, Kellie Hinson, found the evidence sufficient to approve disability benefits for up to one month after Mr. Bunger's June 11 visit.  STD-145.  Unum then approved Mr. Bunger's disability claim from May 9, 2014 to July 10, 2014.  STD-150.

18. On July 25, 2014, Unum requested updated medical records from Dr. Taggart, as well as asking for narrative answers to several questions.  STD-164-66.  On August 5, 2014, Dr. Taggart answered Unum's questions and faxed her updated records.  STD-170-180. The records indicated that Mr. Bunger's fatigue had worsened, and he was now spending a lot of time in bed.  STD-175.  He had trouble falling asleep before 1 to 3 a.m., but after that, he would sleep for ten hours.  *Id.*  He was achy from being in bed so often.  *Id.*  He had a rash on his arms, chest, back, and legs for the last three to four weeks.  *Id.*  He was irritable.  *Id.*  He was not able to help with his kids or household chores.  *Id.*  He was slow to respond at times.  STD-177.  He had some weakness, and was using a cane to walk.  *Id.*  He had also had an incident where he felt nauseous while driving home, and then threw up when he got home.  *Id.*  He had dizzy spells prior to that.  *Id.*  In answering the questions Unum sent her, Dr. Taggart stated that Mr. Bunger had previously had a "full neurological workup with no significant findings."  STD-173.

19. On August 11, 2014, Ms. Hinson reviewed the updated records.  STD-239.  She found that the current records were insufficient to support Mr. Bunger's disability claim.

STD-240.  Ms. Hinson noted that there was no information on file from a neurologist or an infectious disease specialist.  *Id.*  Ms. Hinson stated that she would reach out to Dr. Taggart to obtain the neurology records, and find out if Mr. Bunger had been referred to specialists in rheumatology, infectious disease, physical therapy, or behavioral health. *Id.*

20. On August 14, 2014, Ms. Hinson spoke to Dr. Taggart on the phone.  STD-243.  Dr. Taggart said that Mr. Bunger's main problems were weakness and inability to concentrate.  *Id.*  She had witnessed his inability to concentrate in her office, and had seen him using a cane.  *Id.*  She said that Mr. Bunger had undergone an initial neurological evaluation when he was in the ER.  *Id.*  He had not been referred to an infectious disease specialist.  *Id.*  Mr. Bunger was also struggling with anxiety associated to his medical condition, and had begun seeing a therapist.  *Id.*  He had not been referred to physical therapy yet, but Dr. Taggart said she would consider such a referral in the future.  *Id.*  Based on this conversation, Ms. Hinson recommended approving Mr. Bunger's disability claim for up to one month beyond Mr. Bunger's last visit to Dr. Taggart on July 31.  *Id.*

21. On August 15, 2014, Unum approved Mr. Bunger's disability claim through August 29, 2014.  STD-250.  Unum also informed Mr. Bunger that he would not be eligible for STD benefits beyond October 4, 2014, and so he would be contacted by someone in the LTD department to determine if he was eligible for LTD benefits.  *Id.*

22. On August 29, 2014, Unum's LTD department requested that Dr. Taggart send a medication list, admission and discharge summaries, and diagnostic testing results from

ORDER DENYING PLAINTIFF'S AND DEFENDANT'S CROSS MOTIONS FOR JUDGMENT UNDER FRCP 52 AND REMANDING TO THE ADMINISTRATOR - 10

January 1, 2014 to the present.  LTD-282.  On September 9, 2014, Dr. Taggart faxed the requested documents, but did not include any office visit notes.  LTD 285-309.

23. On September 17, 2014, Sean Jones, in Unum's LTD department, spoke with Mr. Bunger on the phone.  LTD-314.  Mr. Jones noted that they had not received any new medical records from Dr. Taggart, and asked Mr. Bunger if he had seen her recently. *Id.*  Mr. Bunger said he had seen her last week.  *Id.*  Mr. Jones said he would follow up with Dr. Taggart to obtain the notes from that visit.  *Id.*  Mr. Bunger also stated that he recently received lab work that was normal, but that he still had the same symptoms as before.  *Id.*  Mr. Bunger told Mr. Jones he was not treating with a therapist.  LTD-315. Unum then contacted Dr. Taggart and requested the most recent office visit notes. LTD-317, 319.

24. On September 30, 2014, Dr. Taggart faxed the office visit notes and a two-page letter to Unum.  LTD-329-336.  The office visit notes described the same symptoms of fatigue, brain fog, anxiety, and weakness, although all four had improved slightly since the last visit.  LTD-335.  Mr. Bunger also reported an episode where his whole body convulsed while he was on the couch, and then his body felt numb, although this may have been due to an increase in the THC level in his medical marijuana prescription.  *Id.*

25. Dr. Taggart's letter detailed the course of Mr. Bunger's illness, her treatment of him, and his current limitations.  LTD-333-34.  Dr. Taggart stated that she was "treating Mr. Bunger with an antibiotic protocol targeting the Lyme disease and a number of therapies to support detoxification and reduce inflammation."  LTD-334.  While Mr. Bunger had shown some improvement at his last appointment, Dr. Taggart warned that his symptoms were cyclical, and he still had fatigue, dizziness, and cognitive

1
2
3
4
5
6
7
8
9
10

impairments that prevented him from "cooking cleaning, caring for his 2 children, . . . driving," and working.  *Id.*  Dr. Taggart said that she had discussed seeing a neurologist with Mr. Bunger, but they had decided not to schedule an appointment yet, since he was improving with the Lyme disease treatment, and the neurological consult in the ER was normal.  *Id.*  They also decided not to consult with an infectious disease specialist because Dr. Taggart had studied Lyme disease extensively.  *Id.*  Dr. Taggart planned to continue her treatment of Mr. Bunger, and to see him once a month.  *Id.*  Dr. Taggart estimated that Mr. Bunger would not be able to work for another year, although she would re-evaluate him in three months.  *Id.*

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

26.   On October 31, 2014, Dr. Todd Lyon reviewed Mr. Bunger's file for Unum.  LTD-357-360.  Dr. Lyon did not believe that the medical evidence in the file supported Dr. Taggart's finding that Mr. Bunger was unable to work.  LTD-359.  Dr. Lyon did not find that there was evidence of any confirmed medical condition that would cause all of Mr. Bunger's symptoms.  *Id.*  Dr. Lyon said that Mr. Bunger's Lyme disease test was most likely a false positive, since he did not have a rash and he did not have joint or neurological findings consistent with Lyme disease.  *Id.*  Dr. Lyon also noted that Mr. Bunger's self-reported cognitive difficulties were not supported by any cognitive testing.  *Id.*  Dr. Lyon found that Dr. Taggart's treatment and diagnosis of Mr. Bunger did not conform to medical standards.  *Id.*  Given the lack of physical findings to support Mr. Bunger's complaints, Dr. Lyon found it likely that Mr. Bunger was suffering from an undiagnosed psychiatric condition, but it was impossible to confirm that given the lack of behavioral health treatment.  *Id.*

27
28

27. On November 4, 2014, Dr. Lyon called Dr. Taggart to discuss Mr. Bunger. LTD-364. Dr. Taggart verified that she was treating Mr. Bunger for Lyme disease, which was causing him fatigue and anxiety. *Id.* Dr. Taggart suspected that Mr. Bunger had "significant psychological issues" and had suggested referring Mr. Bunger to a behavioral health specialist, but Mr. Bunger had been "somewhat resistant." *Id.* Nevertheless, Dr. Taggart believed that Mr. Bunger was disabled based solely on his physical limitations. *Id.*

28. Dr. Lyon reported to Unum that he continued to disagree with Dr. Taggart's assessment. *Id.* Dr. Lyon believed there were "no clear/consistent examination findings that would impair his physical activities for primarily seated work." *Id.* Dr. Lyon continued to believe that Mr. Bunger's fatigue was "not medically explained" and most likely due to an undiagnosed psychiatric disease. LTD-364-65. Dr. Lyon concluded that there was no need for an independent evaluation of Mr. Bunger's physical functional capacity. LTD-365.

29. Unum then asked Dr. James Bress to review Mr. Bunger's file and give a second opinion. LTD-376-79. Dr. Bress agreed with Dr. Lyon that the medical evidence did not support Dr. Taggart's conclusion. LTD-378-79. Dr. Bress stressed that the acute Lyme disease test was positive, but the chronic Lyme disease test was negative. LTD-378. No repeat Lyme disease testing was done. *Id.* Dr. Bress also noted that Mr. Bunger was treated with a three-week course of Minocin, which should have been sufficient to treat the Lyme disease. *Id.* Dr. Bress concluded that Mr. Bunger's symptoms were likely not caused by Lyme disease. LTD-379. Lyme disease does not normally cause anxiety. *Id.* In addition, Dr. Bress found that Mr. Bunger did not have a

1   tick bite, rash, or joint pain normally associated with Lyme disease. *Id.* Dr. Bress also

2   found that the medical records indicated Mr. Bunger was improving. *See id.*

3   30. On November 5, 2014, Dr. Taggart faxed a letter to Dr. Lyon to follow up on their

4   phone call. LTD-373-75. Dr. Taggart stated that she was "continuing to treat Mr.

5   Bunger for Lyme disease and he is responding well." LTD-374. Mr. Bunger still

6   suffered from fatigue and cognitive issues, but those had been improving. *Id.* His

7   anxiety was also improving. *Id.* His anxiety was being treated with GABA and l-

8   theanine and he did not want to take any other medications for it. *Id.* Dr. Taggart also

9   noted Mr. Bunger's muscle weakness, tremors, impaired balance, weakened reflexes,

10   enlarged lymph nodes, and Raynaud's phenomenon. *Id.* Based on these physical

11   findings, Dr. Taggart believed Mr. Bunger met the diagnostic criteria for chronic fatigue

12   syndrome. *Id.*

13   31. On November 10, 2014, both Dr. Lyon and Dr. Bress reviewed Dr. Taggart's letter, but

14   their opinions remained unchanged. LTD-382-86. Dr. Lyon said that chronic fatigue

15   syndrome is a diagnosis of exclusion, and so a co-existing diagnosis of Lyme disease

16   and chronic fatigue syndrome is not possible. LTD-382. Therefore Mr. Bunger's

17   symptoms remained medically unexplained. *Id.* Dr. Bress pointed out that behavioral

18   health issues can cause the same symptoms as both Lyme disease and CFS. LTD-385.

19   32. On November 12, 2014, Unum denied Mr. Bunger's LTD claim. LTD-388. On

20   November 17, 2014, Unum denied his STD claim. STD-339. Unum said that, based on

21   Mr. Bunger's medical records, "it was not clear why [he] w[as] unable to perform the

22   duties of [his] job." LTD-389. Unum said that Dr. Taggart's diagnosis of Lyme disease

23   was not in accordance with Center for Disease Control criteria. *Id.* Unum concluded

ORDER DENYING PLAINTIFF'S AND DEFENDANT'S CROSS MOTIONS FOR JUDGMENT
UNDER FRCP 52 AND REMANDING TO THE ADMINISTRATOR - 14

that Mr. Bunger's complaints remained "medically unexplained, and could be associated with a psychological condition however we did not have any behavioral health records on file to review for support of such condition." *Id.* The letter mentioned Dr. Taggart's diagnosis of chronic fatigue syndrome, but did not elaborate on why that diagnosis was unsupported. *See id.* The letter also stated that, in order to appeal, Mr. Bunger needed to "submit a written letter of appeal outlining the basis for your disagreement." LTD-392. Mr. Bunger was told to include "any additional information you would like considered. . . . includ[ing] written comments, documents, or other information in support of your appeal." *Id.*

33. On December 2, 2014, Mr. Bunger called Sean Jones in Unum's LTD department to ask what CDC criteria the letter referred to. LTD-400. Mr. Jones said he had not done the review himself, so he was not sure, but looking at the letter, it appeared the Lyme disease test results would be considered negative by CDC standards, and Mr. Bunger did not have a rash and did not have joint or neurological findings consistent with Lyme disease. *Id.*

34. On December 15, 2014, Mr. Bunger filed a two-page appeal of Unum's decision. LTD-407-08. Mr. Bunger stated that it appeared to him that the basis of his denial was that his diagnosis of Lyme disease was not in accordance with CDC criteria. LTD-407. Mr. Bunger then attempted to show that his diagnosis did conform to CDC criteria, because: (1) a blood test is not required by the CDC criteria; (2) not all patients with Lyme disease have a rash; and (3) he did have joint and neurological problems. LTD-408. In conclusion, Mr. Bunger said, "If there are other reasons that have not been provided to

me for which my claim was denied I would like the opportunity to address those as well." *Id.*

35. On January 21, 2015, Dr. Beth Schnars reviewed Mr. Bunger's appeal. LTD-469-72. Dr. Schnars concluded that Mr. Bunger's medical records did not show that he was disabled. LTD-470. Dr. Schnars said the medical records did not support a diagnosis of Lyme disease because: (1) Mr. Bunger lives in a non-endemic area; (2) his symptoms appeared in the winter; (3) he did not have a rash; (4) one of his Lyme disease tests came back negative and the other one was from a non-FDA approved lab; and (5) false positives for that particular Lyme disease test are common. LTD-471. Moreover, if Mr. Bunger did have Lyme disease, it should have resolved with a short course of antibiotic treatment. *Id.* Dr. Schnars also stated that there was no "serologic, metabolic, endocrine, infectious or hematologic indication of" autonomic dysregulation, chronic fatigue, vasculitis, or chronic dizziness. *Id.* Most physical exam findings were normal, except for "episodic generalized weakness, clonus, and positive Hoffman's which is indicative of upper motor neuron disease." *Id.* Dr. Schnars stated that if these findings really were present, then Mr. Bunger should have been referred to a neurologist for further testing. *Id.* In addition, Dr. Schnars found that "[t]he medical records do not identify an underlying etiology for reports of fatigue" because "additional diagnostic criteria ha[ve] not been documented" and "[t]here [was] no basic in office testing of cognitive functioning." LTD-472. Dr. Schnars also pointed out that Mr. Bunger did not receive the typical treatment for chronic fatigue, which is aerobic activity and cognitive behavioral therapy. *Id.* Finally, Dr. Schnars noted that anxiety was documented throughout the medical records. *Id.* Dr. Schnars found that Mr. Bunger's anxiety was

not "optimally controlled," which may have impacted his functioning, but the medical records were insufficient to show limitations based on behavioral health issues. *Id.* On January 23, 2015, Unum denied Mr. Bunger's appeal, for the reasons given by Dr. Schnars. LTD-480-83. This litigation followed.

## IV. CONCLUSIONS OF LAW

**A. Standard under ERISA**

1. ERISA provides that a qualifying ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."). The Court finds that Mr. Bunger is a qualified participant.

2. As discussed above, ERISA does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations. *Firestone*, 489 U.S. at 109. The parties, however, have stipulated to *de novo* review. Dkt. ##13 at 15; 14 at 9. The Court accepts the parties' stipulation and reviews the record *de novo*. *See Rorabaugh*, 321 F. App'x at 709 (court may accept parties stipulation to *de novo* review). "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). The administrator's "evaluation of the evidence is not accorded any deference or

presumption of correctness." *Perryman v Provident Life & Acc. Ins. Co.*, 690 F. Supp. 2d 917, 942 (D. Ariz. 2010).   In reviewing the administrative record and other admissible evidence, the court "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014) (quoting *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program,* 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010)).

3.  When a district court "reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant." *Muniz*, 623 F.3d at 1294; *see also Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (the claimant "bears the burden of proving his entitlement to contractual benefits").   However, this does not relieve the plan administrator from its duty to engage in a "meaningful dialogue" with the claimant about his claim.   *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("[W]hat [29 C.F.R. § 2560.503-1(g)] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. . . . [I]f the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.").   Even on *de novo* review, this Court can remand a disability claim to the plan administrator if the record is not sufficiently developed.   *See Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 944 (9th Cir. 1995) (finding that "additional evidence is necessary to conduct an adequate de novo review of the benefit decision" and "leav[ing] to the district court whether to remand to the plan administrator for an initial factual determination"); *Kowalski v. Farella, Braun & Martel, LLP*, No. C–06–3341 MMC,

2008 WL 5397511, at *15 (N.D. Cal. Dec. 23, 2008) (finding, on *de novo* review, that "there is inadequate medical and vocational evidence in the record to support a finding on such issue, and [the Court] will remand the claim to the administrator for consideration").

**B.  The Court Cannot Determine on this Record Whether Mr. Bunger is Disabled**

4.  The parties agree that Mr. Bunger was covered under the STD and LTD plans.  *See* Dkt. ##13 at 3; 14 at 1-2.  At issue is whether Unum correctly denied Mr. Bunger's claim, and whether Mr. Bunger has met his burden of proof to show he is disabled.  Dkt. ##13 at 14-15; 14 at 9-10.  As will be discussed below, the Court cannot determine whether Mr. Bunger is disabled, because Unum has failed to sufficiently develop the record.  Therefore the Court will remand Mr. Bunger's case to Unum for further development of the record.

5.  Having reviewed Unum's denial letters, internal documents, and litigation papers, the Court can summarize the reasons for Unum's denial as follows: (1) it is unlikely that Mr. Bunger has Lyme disease; (2) Mr. Bunger was not properly diagnosed with chronic fatigue syndrome because Dr. Taggart did not rule out other potential causes of Mr. Bunger's symptoms since she failed to re-test for Lyme disease and did not refer Mr. Bunger to an infectious disease specialist, a neurologist, or a behavioral health specialist; and (3) Mr. Bunger's functional limitations have not been tested by cognitive testing.  *See* STD-82, 240; LTD-359, 364-65, 378-79, 382, 385, 389, 470-72, 480-83; Dkt. #14 at 10-16.

6.  These arguments are fairly convincing in terms of showing that Mr. Bunger has not conclusively shown that he is disabled.  But even if all of these arguments are correct,

all they show is a need for more information.  Unfortunately, Unum did not ask for more information.  Unum did not ask Dr. Taggart or Mr. Bunger if he could be re-tested for Lyme disease.  Nor did they ask that he be referred to an infectious disease specialist, a neurologist, or a behavioral health specialist.  Nor did they ask that Dr. Taggart perform cognitive testing on Mr. Bunger, or refer him to another doctor to perform such testing.  They did not request that Mr. Bunger attend an IME.  *See* LTD-364-365 (Dr. Lyon finding that Mr. Bunger "has no clear/consistent examination findings that would impair his physical activities for primarily seated work[,] . . . [h]e reports significant fatigue, which in my opinion is medically unexplained[,] [t]he diagnosis of Lyme disease has not been established by CDC criteria[,] . . . [and] a B[ehavioral] H[ealth] provider has not evaluated [him]," yet concluding that "an independent evaluation of his physical functional capacity is not required at this time").

7. It is true that Unum repeatedly asked Dr. Taggart for her records regarding testing and referrals, but there is no evidence that Unum told Mr. Bunger or Dr. Taggart that Mr. Bunger's claim would be denied without referrals to other doctors or additional testing.  *See* STD-88, 164, 243; LTD-282, 364.  It does not appear that Unum even suggested to Mr. Bunger or Dr. Taggart that it would be wise to obtain this evidence.  *See* STD 243; LTD-314-15, 364.

8. Unum's internal documents are rife with their concerns about lack of testing.  *See* STD 82; 240; LTD-359, 364-65, 378-79, 382, 385, 470-72.  But these concerns were not shared with Mr. Bunger or Dr. Taggart.  *See* STD-243; LTD-314-15, 364.  Even when denying Mr. Bunger's claim, Unum did not suggest that Mr. Bunger should have further testing done.  *See* LTD-389, 392.  Unum stated that there was "no medical evidence on

file that . . . supported any work restrictions or impairments," but did not indicate that this was a situation that could be remedied with more testing. LTD-389. Even when Mr. Bunger appealed, and asked that he be told if there were any reasons for the denial besides the failure to meet the CDC's criteria for diagnosing Lyme disease, *see* LTD-408, Unum did not advise Mr. Bunger to obtain more testing.

9.   Unum appears to conflate the issue of whether Mr. Bunger is sick with the issue of whether Mr. Bunger has been properly diagnosed. *See* Dkt. #14 at 10-15. Unum may be correct that Mr. Bunger has not been correctly diagnosed. But that does not mean he is not sick. If Mr. Bunger's complaints, and Dr. Taggart's assessments, are to be believed, Mr. Bunger cannot focus for more than a few minutes at a time, making it impossible for Mr. Bunger to perform the varied and complex tasks his job requires. *See* STD-49, 134, 172-73, 175-78, 243; LTD-45-74, 100, 333-36, 364, 370, 374-75. If Mr. Bunger is unable to cook, clean, or care for his children, *see* LTD-334, it is highly unlikely that he can spend eight hours a day developing content for Costco's website *see* LTD-368. Unum never seems to suggest that Mr. Bunger's complaints are untrue, just that those complaints have not been properly tested, diagnosed or treated. *See* Dkt. #14 at 10-15. The proper response, then, would have been for Unum to inform Mr. Bunger of this fact, so that he could have obtained the necessary testing, diagnosis, and treatment, not to simply deny Mr. Bunger's claim.

10.   Unum argues that, because this Court is reviewing Mr. Bunger's claim *de novo*, Unum's handling of Mr. Bunger's claim is irrelevant, and all that matters is whether Mr. Bunger has met his burden of proof to show he is disabled. Dkt. # 16 at 8. But it would be manifestly unjust for this Court to find for Unum based on Mr. Bunger's

failure to meet his burden of proof, when it is entirely possible that the only reason Mr. Bunger has not met his burden of proof is that Unum has failed to ask Mr. Bunger for the additional testing it considers so critical.  Therefore, the Court will deny both motions for judgment, and remand to Unum with instructions to inform Mr. Bunger of what additional testing or diagnostics it requires in order to make an informed decision as to whether Mr. Bunger is able to perform his job functions.

## V.  CONCLUSION

Having reviewed Plaintiff's and Defendant's cross motions, the responses in opposition thereto and replies in support thereof, the Court hereby FINDS and ORDERS:

1) Plaintiff's Motion for Judgment under Federal Rule of Civil Procedure 52 (Dkt. #13) is DENIED.

2) Defendant's Motion for Judgment under Federal Rule of Civil Procedure 52 (Dkt. #14) is DENIED.

3) The Court REMANDS to Unum with instructions to inform Mr. Bunger of what additional testing or diagnostics it requires in order to make an informed decision as to whether Mr. Bunger is able to perform his job functions.

4) This matter is now CLOSED.

DATED this 20th day of July, 2016.


*Richard A Jones*
_____
The Honorable Richard A. Jones
United States District Judge