UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRIS BUNGER, | |
| Plaintiff, | CASE NO. C15-1050-RAJ |
| v. | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | ORDER RE: SECOND CROSS MOTIONS FOR JUDGMENT |
| Defendant. | |

## I.       INTRODUCTION AND BACKGROUND

Plaintiff Chris Bunger brings this action against Defendant Unum Life Insurance Company

of America (Unum) under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §

1001 *et seq*.  He seeks to recover benefits under the Costco Employee Benefits Program's –

Voluntary Short Term Disability Plan (STD Plan) and the Costco Employee Benefits Program's –

Long Term Disability Plan (LTD Plan).

The Court previously denied the parties' cross motions for judgment under Federal Rule

of Civil Procedure 52, issuing Findings of Fact and Conclusions of Law in an Order dated July 20,

2016.  Dkt. 24.  As described in that Order, Mr. Bunger became ill in early 2014, while working

as a Web Content Specialist for Costco Wholesale Corporation.  After providing STD benefits for

periods of time between January and August 29, 2014, Unum found plaintiff no longer eligible for STD benefits and denied LTD benefits. Mr. Bunger filed suit, alleging total disability due to chronic fatigue syndrome (CFS), Lyme disease, or an unspecified illness causing fatigue and inability to concentrate. Unum argued plaintiff has no properly diagnosed conditions and has not shown his inability to perform his job.

The Court concluded Unum failed to sufficiently develop the record. Unum had denied benefits because (1) it was unlikely Mr. Bunger has Lyme disease; (2) Mr. Bunger was not properly diagnosed with CFS because other potential causes of symptoms had not been ruled out, with no re-test for Lyme disease or referrals to an infectious disease specialist, neurologist, or behavioral health specialist; and (3) Mr. Bunger had not undergone cognitive testing. However, these arguments only showed a need for more information, which Unum had not requested or even suggested. Unum appeared to conflate the issue of whether Mr. Bunger is sick with the issue of whether he has been properly diagnosed. Even if not correctly diagnosed, it did not mean Mr. Bunger was not sick, and Unum should have informed Mr. Bunger of the need for further testing, diagnosis, or treatment. The Court remanded with instructions to Unum to inform Mr. Bunger of the additional testing or diagnostics required to make an informed decision as to whether he is able to perform his job functions.

On remand, Unum again denied Mr. Bunger benefits. Mr. Bunger filed an unopposed motion to reopen the action. This matter now comes before the Court on the parties' second cross motions for judgment under Rule 52. Mr. Bunger seeks a judgment declaring he meets his burden of showing disability under the STD plan from August 30 to October 4, 2014, disability from his "own job" under the LTD plan from October 5, 2014 to July 5, 2015, and disability from "any gainful occupation" under the LTD plan from July 6, 2015 through the present. Dkt. 47. Unum

asks that the Court affirm its benefits decision and grant judgment in its favor. Dkt. 53. Unum also argues that, if the Court finds Mr. Bunger meets his burden of proving his inability to perform his own job at Costco for the first nine months of LTD benefits, the Court should remand to Unum the question of whether Mr. Bunger was disabled under the more stringent any gainful occupation standard after that point.[1]

As before, the Court conducts a *de novo* trial of this matter under Rule 52 based on the administrative record considered by Unum. *See* Dkt. 24 at 2-3. The administrative record now before the Court is comprised of (1) Unum's file for plaintiff's claim for STD benefits (STD 1-447), Dkt. 12; (2) Unum's file for plaintiff's claim for LTD benefits (LTD 1-513), Dkt. 12; and (3) Unum's expanded claim file (AR 1-992), Dkt. 48.[2] Plaintiff also asks that the Court consider a new declaration not included in the administrative record. *See* Dkt. 51. The Court now issues the following findings and conclusions pursuant to Rule 52.

## II.    FINDINGS OF FACT

1.  The Court incorporates its prior findings of fact as set forth in its July 20, 2016 Order. Dkt. 24. With exceptions to allow for a complete understanding of the issues, the Court does not re-state those facts here.

2.  Chris Bunger's job as a Web Content Specialist for Costco Wholesale Corporation required "[e]xcellent written and verbal communication skills, . . . [s]trong organizational

---

[1] Unum states the own job LTD period runs through June 5, 2015. *See* Dkt. 49 at 13; Dkt. 53 at 5. However, as reflected in the Court's prior findings of fact and acknowledged in Unum's briefing, the LTD eligibility period began on October 5, 2014, Dkt. 24 at 10, Dkt. 49 at 3, Dkt. 53 at 4, and the nine-month conclusion of that period would extend through July 5, 2015.

[2] Plaintiff explains that the first 513 pages of the expanded claim file are, with few exceptions, the same as the original LTD claim file, with some new material at pages AR 1, 3, and 16, and newly added documents at AR 514 through AR 992.

and analytical skills, and attention to detail[,]" as well as the ability to multi-task and perform a variety of complex tasks. LTD 368, 370. Through his employment with Costco, Mr. Bunger was offered STD and LTD benefits in plans administered by Unum Life Insurance Company of America. STD 378; LTD 450.

3. Unum's STD Plan provides for 26 weeks of benefits, awarded if an employee is "limited from performing the material and substantial duties of [his] own job . . . due to . . . sickness or injury; and [he] ha[s] a 20% or more loss in weekly earnings." STD 367, 371.

4. Unum's LTD Plan provides for benefits beyond the 26-week window. LTD 434. For the first nine months of LTD coverage, "disabled" is defined in the same way for LTD benefits as it is for STD benefits. LTD 428. After nine months, an employee must show he is disabled from "any gainful occupation" as opposed to just his "own job." *Id.*

5. Both the STD and LTD plans define "sickness" as "an illness or disease," and require a showing the claimant is "under the regular care of a physician." STD 358, 377; AR 420, 450. "Regular care" is defined as personal visits to a physician and receipt of "the most appropriate treatment and care which conforms to generally accepted medical standards for your disabling condition(s) by a physician whose specialty or experience is the most appropriate" for those conditions. *Id.*

6. Under the LTD plan, disabilities "which are primarily based on self-reported symptoms, and disabilities due to mental illness have a limited pay period up to 18 months." AR 436 (emphasis removed).

7. The STD and LTD plans provide for payments to stop at the earliest of certain events. For STD benefits and for the first 9 months of LTD benefits, payments stop when a claimant is "able to work in [his] own job or a reasonable alternative" offered by the claimant's

employer "on at least a part-time basis but [the claimant] choose[s] not to[.]" STD 371; AR 436. After the first 9 months of LTD benefits, part-time work need not be offered by the claimant's employer, and payments stop "when you are able to work in any gainful occupation on a part-time basis but you chose not to[.]" *Id.* Part-time basis "means the ability to work and earn between 20% and 80%" of weekly earnings for STD benefits and indexed monthly earnings for LTD benefits. STD 376; AR 449.

8. Unum approved Mr. Bunger's claims for STD benefits for some 22 weeks between early January and August 29, 2014. STD 56, 77, 145, 150, 250. Unum denied further STD benefits and LTD benefits, STD 339; LTD 388-89 and, on January 23, 2015, denied Mr. Bunger's appeal, LTD 480-83.

9. Dr. Traci Taggart, a naturopath and Mr. Bunger's primary care provider, gave Costco an update on his status in a January 30, 2015 letter. AR 793. Mr. Bunger continued to have chronic fatigue, weakness in his lower extremities, anxiety, and cognitive impairments, and was unable to work. *Id.* Dr. Taggart extended Mr. Bunger's FMLA leave for an additional month and estimated his return to work as March 1, 2015. *Id.*

10. Although Mr. Bunger remained symptomatic, he improved to the point he was able to return to work part-time. Dr. Taggart approved Mr. Bunger's return to his job, for two days a week, six hours per day, from March 2 through June 30, 2015. AR 787-92. Mr. Bunger could not start work before 7:00 a.m., had symptoms that may wax and wane, and may miss some scheduled work days or need to leave early. *Id.*

11. In June 2015, Dr. Taggart approved an increase to eight-hour days, two days a week, following further improvement in Mr. Bunger's symptoms. AR 786. However, Mr. Bunger stopped working that same month. AR 854. He at times found it difficult to focus

and concentrate, became exhausted after a few hours, missed scheduled days, and ultimately had to stop working. *Id.*

12. On June 29, 2015, Mr. Bunger filed suit in this Court. Dkt. 1.

13. By September 2015, Mr. Bunger's health had improved and Dr. Taggart approved his return to work for three days a week, eight hours per day, through October 31, 2015. AR 779, 781-84. Dr. Taggart noted physical examination revealed hyperreflexia and mild weakness in Mr. Bunger's lower extremities and labs showed mild immune dysregulation. *Id.* Dr. Taggart suggested the ability to work remotely would mitigate some of Mr. Bunger's challenges in returning to work. *Id.*

14. In early November 2015, Dr. Taggart reported that Mr. Bunger continued to show significant improvements in his health, but was starting a new treatment protocol, which would likely cause him to feel worse initially. AR 778. His symptoms remained and physical examination revealed mild hyperreflexia, improved from the previous visit, and mild weakness in his hands. *Id.* Dr. Taggart approved work three days a week, one-to-two days in the office and one-to-two days at home, for eight hours per day, through December 31, 2015. *Id.*

15. Costco declined Mr. Bunger's request to return to work on a part-time basis. *See* AR 692, 854.

16. Following the Court's July 2016 remand, Dr. Robert G. Sise, MD, a psychiatrist, conducted a Comprehensive Psychiatric Evaluation of Mr. Bunger on behalf of the Social Security Administration (SSA). AR 626-30. In the September 10, 2016 examination, Mr. Bunger reported a variety of symptoms and indicated he needed assistance in his day-to-day functioning, had difficulty shopping, made few mistakes on tasks given the simplification

of his life, and avoided most social situations. AR 626-27. He was enrolled as a fulltime student "in a BS in software development" at Western Governor's University (WGU), where he was passing his "graded pass-fail" classes. AR 628. On mental status examination (MSE), Mr. Bunger had fair cooperation and effort, appeared spontaneous and genuine, with a somewhat timid interpersonal style, and struggled at times to initiate his responses, but was overall fairly social, with fair attention, a restricted affect, and glimpses of depression and anxiety. *Id*. Dr. Sise diagnosed unspecified anxiety, depressive, and neurocognitive disorders. AR 629. Given the description of several neurovegetative symptoms and a somewhat depressed affect, Dr. Sise found a clear concern for depression. *Id*. "He also reports experiencing significant anxiety and excessive worry that cause him considerable subjective distress." *Id*. Dr. Sise found Mr. Bunger's report of a "modest cognitive decline from a previous level of performance in the domains of complex attention, learning and memory" to be "somewhat apparent" on examination. *Id*. Dr. Sise stated formal neuropsychiatric testing would facilitate a more thorough assessment of deficits, and that Mr. Bunger's "psychiatric illness may be secondary to Lyme Disease but other indeterminate etiologies may also contribute." *Id*. Dr. Sise found no evidence of malingering or factitious disorder, the psychiatric diagnoses somewhat treatable, prognosis fair, and improvement possible in the next twelve months assuming optimal treatment. *Id*. Dr. Sise opined Mr. Bunger had fair ability to perform simple and repetitive tasks and fair to limited ability to perform detailed and complex tasks and perform work activities on a consistent basis without special or additional instructions based on his cognitive examination performance; fair to limited ability to perform work activities at a sufficient pace based on his ability to perform activities of daily living; fair to limited ability to

maintain regular attendance and complete a normal workday without interruption given his current functional status and recent work history; and fair to limited ability to interact with coworkers, superiors, and the public, and to adapt to usual work stresses based on his interpersonal presentation. AR 630.

17. In a November 2016 letter, Dr. Michael Badger, Ph.D., a psychologist, noted his treatment of Mr. Bunger on eighteen occasions since May 3, 2016. AR 631. Dr. Badger opined Mr. Bunger's "anxiety is not the cause of his occasionally disabling fatigue, so much as the result of it." *Id.* He had not seen Mr. Bunger's medical records, but had no reason to doubt the authenticity or accuracy of the diagnosis. *Id.* Dr. Badger diagnosed General Anxiety Disorder and stated Mr. Bunger was working to achieve greater independence and on recalibrating the contribution he could make to his family, and was enrolled at WGU. *Id.* While the unpredictability and recurring nature of Lyme disease and/or CFS was a source of ongoing anxiety, Mr. Bunger was making a good faith effort to address his therapy goals to better cope with his chronic illness and anxiety. *Id.* While noting material progress, Dr. Badger did not find Mr. Bunger capable of performing consequential work-related activities on a sustained basis. *Id*

18. Dr. Richard Neiman, a rheumatologist, examined plaintiff on November 8, 2016. AR 633-36. Mr. Bunger was "about 70% better", but still had problems with memory and concentration, and a "brain fog" sensation. AR 633. He reported occasional pains, fatigue much of the time, and becoming anxious in public occasionally. *Id.* He was taking classes online. *Id.* The physical examination results were normal, with no fibromyalgia tender points. AR 634. Laboratory work had been unremarkable, with a "normal CRP" (C-reactive protein), and Mr. Bunger had had both negative and positive Lyme tests, "elevated

antibodies to CMV and EBV", and an "elevated C4A." *Id*. Dr. Neiman noted the differential diagnosis of Lyme disease with immunologic response, CFS, and fibromyalgia without tender points and advised Mr. Bunger may never have a clear diagnosis. AR 634-35. He describes CFS as "a debilitating disorder characterized by profound fatigue that is not improved by bed rest and that may be worsened by physical or mental activity." AR 635. "Symptoms affect several body systems and may include weakness, muscle pain, impaired memory and/or mental concentration, and insomnia, which can result in reduced participation in daily activities." *Id*. Dr. Neiman describes fibromyalgia as "a type of muscular or soft-tissue rheumatism that principally affects muscles and their attachment to bones, commonly accompanied by widespread musculoskeletal pain, muscle stiffness, sleep disturbances, fatigue, lack of concentration, changes in mood or thinking, anxiety and depression." *Id*. CFS and fibromyalgia "blend together somewhat, and are part of the same disease spectrum." *Id*. "There is no laboratory test for either" and, while previously diagnosed by tender points at fixed locations, a fibromyalgia diagnosis can be based, under revised criteria, on fatigue and diffuse pain without tender points. *Id*. Dr. Neiman opined: "There is nothing unusual about a patient presenting with symptoms such as those Mr. Bunger reports and the physicians being unable to identify a specific diagnosis. There is nothing unusual with a patient having multiple working diagnoses, as here, where the differential diagnosis includes the three diseases identified above." *Id*. Based on reports from Dr. Badger and Dr. Sise, it did not appear there was any psychiatric or neurologic cause for Mr. Bunger's fatigue, pain, and cognitive complaints, which made it "yet more likely that his correct diagnosis is [CFS], fibromyalgia or chronic Lyme disease." AR 636. A finding of no neurological disorder would make one of those diagnoses "most likely"

correct. *Id*. Although he had no prior direct knowledge of Mr. Bunger, Dr. Neiman found the reported overwhelming fatigue, pain, and cognitive fog over the last few years credible, had no reason to doubt Mr. Bunger's reported symptoms, and had no reason to suspect malingering or symptom magnification. *Id*. Given the absence of any known cures, Mr. Bunger's pursuit of alternative or complementary therapies was not unusual. *Id*. While Mr. Bunger could try empiric immunosuppressive therapy, Dr. Neiman did not personally recommend that course of action unless there was deterioration given the fairly substantial risk. AR 634. "Since he is 70% better [Mr. Bunger] opted against the therapy." *Id*.

19. Sean Jones, the Unum benefits specialist assigned to Mr. Bunger's claim both before and after remand, requested an update on Mr. Bunger's condition and treatment on November 14, 2016. AR 638. Mr. Bunger's counsel responded with a medical update and records shortly thereafter. AR 640-54, 656-70. Counsel also alleged Unum's violations of the regulations governing appeals of adverse benefit determinations at 29 C.F.R. § 2560.503-1 by not acting within forty-five days of the remand and by allowing Mr. Jones' involvement despite his involvement in the prior determination. AR 640-41.

20. Unum asked Dr. Todd Lyon to review the new medical information from Drs. Sise, Badger, and Neiman. Prior to remand, Dr. Lyon found Mr. Bunger's symptoms medically unexplained and the medical evidence to not support a finding of inability to work. AR 359, 364-65, 382. He believed the Lyme disease test was most likely a false positive, found an undiagnosed psychiatric condition likely, and deemed a co-existing diagnosis of Lyme disease and CFS not possible because CFS is a diagnosis of exclusion. *Id*. On December 13, 2016, Dr. Lyon concluded the medical information submitted after remand did not change his opinion. AR 674-65. He found the evidence, dated in September and

November 2016, of limited value in determining impairment during the January 2014 timeframe in which plaintiff stopped working. AR 675. Dr. Lyon reiterated his prior explanation of the missing medical evidence to support impairment and the diagnosis of Lyme disease. *Id.*

21. In a December 14, 2016 letter, Mr. Jones informed plaintiff the new medical evidence did not establish the presence of a confirmed medical condition that would explain his multiple complaints. AR 678. The letter described the MSE by Dr. Sise as unremarkable and not consistent with cognitive impairment, and noted the absence of further neuropsychological evaluation. *Id.* Unum considered the updated evaluations to be of limited value in addressing functional capacity as of January 2014 and not containing any medical evidence to support Mr. Bunger's inability to perform his job at that time. *Id.* Unum advised that Lyme disease serology testing performed by an FDA approved laboratory and MRI imaging would be helpful to further evaluate the claim. *Id.* Although it would not reconstruct a cognitive condition as it existed two years prior, Unum would consider a current neuropsychological evaluation if provided. *Id.*

22. Counsel for Mr. Bunger responded on January 31, 2017. *See* AR 689-863. Attachments to the letter from counsel included, *inter alia*, a negative Lyme test result from earlier in the month, AR 810-12, two negative brain MRIs from 2014, AR 818-20, and additional treatment records from Dr. Taggart, AR 722-94.

23. ARNP David Coots had examined Mr. Bunger on July 12, 2016. AR 795-808. The record from ARNP Coots showed a normal physical examination and Mr. Bunger's report he "still gets a fair amount of fatigue, cognitive decrease, general body aches, tires easily." *Id.*

24. Dr. Lee-Loung Liou had conducted a neurological examination on November 21, 2016.

AR 707-20. Mr. Bunger reported his previous neurologic symptoms had mostly improved, with the remaining residual symptom of fatigue. AR 708. The neurological examination was normal, with a 30/30 MSE score. AR 709-14. Dr. Liou believed any further neurological testing would be of low yield given improvement in symptoms and the negative MRI results during the time when symptoms were worse. AR 714. Mr. Bunger declined to obtain a new MRI in light of Dr. Liou's opinion and the expense. *See* AR 691.

25. Mr. Bunger also provided a declaration dated January 30, 2017. AR 854-56. Mr. Bunger stated he was unable to return to work on a full-time basis because he has both good and bad days, and could not work on the bad days. AR 854. His fatigue caused him to feel very heavy, slowed down, without full control of his body, groggy, drained, without energy, irritable, and thin-skinned, and affected the rest of his health. AR 854-55. On his bad days, a brain fog made it hard for him to keep his focus, read, and pay attention. AR 855. He had a lot of anxiety and found seeing a counselor somewhat helpful. *Id*. His condition had improved since 2014, but not to the point where he had consistent energy and strength. *Id*. Exertion on one day usually caused increased fatigue on the following day. *Id*. On good days, Mr. Bunger could accomplish some tasks, such as caring for his children by himself for a few hours, take short walks, do simple exercises, and some household chores. *Id*. On bad days, it was difficult to read or write, get out of bed and get dressed, interact with or not require the help of his family, and keep his focus in active environments, such as large stores. *Id*. He had about as many good days as bad and could not predict the type of day he would have. *Id*. Mr. Bunger also continued to have pain, usually an ache or sore/stiff feeling in his feet, ankles, hands, legs, or back that did not, by itself, stop him from being able to do things. *Id*. Occasionally, he had muscle

pain/tenderness or tightness on either side of his body, on a handful of occasions had a seizing or stabbing pain so bad it caused him to buckle over, and he had occasions of back pain so severe he had to lie down. *Id.* Mr. Bunger's fatigue, not the incidents of pain, prevented him from working. *Id.*

26. In February 2017, Mr. Jones clarified Unum did not require a new brain MRI. AR 869. Interpreting the letter from counsel as implying Mr. Bunger had fibromyalgia and/or CFS, Unum was evaluating the new medical information in order to determine whether or not it changed the prior claim decision. *Id.*

27. Dr. Taggart provided another update to Unum recounting her last appointment with Mr. Bunger on October 5, 2016. AR 873, 879. Mr. Bunger continued to have fatigue, difficulty concentrating, and occasional joint pain and weakness. *Id.* Sitting for long periods of time caused pain in the pelvic area, improved by lying down and resting. *Id.* He was "doing better overall, but his symptoms are persistent, occurring more days than not, especially fatigue." *Id.* Mild mental or physical exertion caused increased fatigue, pain, and difficulty concentrating the following day. *Id.* His persistent symptoms prevented him from being able to work at any job on a regular, continuous, or predictable basis. *Id.*

28. On February 24, 2017, Dr. Lyon reviewed the new materials in Mr. Bunger's claim file and found they did not support any change in his opinion. AR 883. Dr. Lyon continued to opine the medical evidence did not support preclusion from full-time primarily seated work activities, with no force exertion over ten pounds, occasional standing and walking, and frequent handling and fingering, from January 14, 2014 to the present. AR 883-84.

29. Dr. James Bress reviewed the updated medical record on March 10, 2017 and found no change in his opinion prior to the remand that Mr. Bunger was capable of full-time work.

AR 886-87.  Lyme disease had not been confirmed and plaintiff had received antibiotics adequate for its treatment.  *Id.*  Dr. Bress found the CFS diagnosis not confirmed, observing Mr. Bunger had not had any sore throat, tender lymph nodes, headaches, or unrefreshed sleep, and that behavioral health issues which can cause fatigue had been noted.  *Id.*  Mr. Bunger's pain had been mild and, on October 2, 2016, Dr. Taggart noted plaintiff was "'doing better'", with only "'occasional joint pain and weakness.'"  *Id.*

30. On April 3, 2017, Diane Suess, a registered nurse, reviewed the record for Unum and found no support for any restrictions or limitations due to behavioral health issues.  AR 973-74. She noted "a couple of mentions of some anxiety", but no disabling behavioral health conditions.  *Id.*

31. Dr. Alex Ursprung, Ph.D., a psychologist, also reviewed the record for Unum on April 19, 2017.  AR 980-82.  Among other evidence in the claim fail, Dr. Ursprung took note of references to Mr. Bunger going to school full-time.  While Mr. Bunger may have some anxiety secondary to his medical complaints and medical complaints may have some component of behavioral health etiology, Dr. Ursprung found no evidence a behavioral health condition created restrictions or limitations.  *Id.*

32. By letter dated April 20, 2017, Mr. Jones informed Mr. Bunger that Unum had not changed its prior decision.  AR 987-88.  Unum's medical department continued to state the diagnosis of Lyme disease had not been confirmed and its physician found CFS not supported by any documented sore throat, tender lymph nodes, headaches, or unrefreshed sleep, "which are all normal symptoms of that condition."  AR 987.  While the record contained a fibromyalgia diagnosis, no tender points had been found by Dr. Neiman and Mr. Bunger's CRP, which can be an indicator of fibromyalgia, was at a normal level of

.03.  *Id.*  The new information did not provide medical evidence of any physical/organic medical problems that would support changing the decision.  *Id.*  Nor did the medical evidence support any restrictions or limitations due to behavioral health conditions.  *Id.* The letter pointed to a September 8, 2014 office visit with Dr. Taggart in which Mr. Bunger had no emotional lability, no depression, no suicidal or homicidal ideation, no hallucinations, and no memory loss, and the 2016 evidence from Drs. Sise and Badger.  *Id.*

33. All of Unum's decisions to grant or deny benefits related solely to the question of whether Mr. Bunger could perform his own job.  *See* STD 250, 339; LTD 388-89, 480-83; AR 987. Mr. Bunger has not yet made a claim and there are no decisions from Unum addressing his ability to work in any gainful occupation.

### III.    CONCLUSIONS OF LAW

#### A. Standard of Review, Burden of Proof, and Evidence Considered

1.   The Court previously determined it may conduct a *de novo* trial under Rule 52, as had been stipulated to by the parties.  "When conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010).  In a trial on the administrative record, the Court "can evaluate the persuasiveness of the conflicting testimony and decide which is more likely true."  *Kearney v. Standard Ins. Co.*, 157 F.3d 1084, 1095 (9th Cir. 1999).  The Court may give appropriate weight to the conclusions of a physician upon finding the physician's opinions reliable and probative.  *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006). The Court's evaluation of the evidence "'necessarily entails making reasonable inferences

where appropriate.'" *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014) (quoted source omitted).

2. With *de novo* review of a plan administrator's decision, the claimant bears the burden of proof. *Muniz*, 623 F.3d at 1294. The claimant must demonstrate disability under the terms of the plan by a preponderance of the evidence. *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162-63 (9th Cir. 2016) (citing *Muniz* 623 F.3d at 1294). This does not relieve the plan administrator from its duty to engage in a "meaningful dialogue" with the claimant about his claim. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("[W]hat [29 C.F.R. § 2560.503-1(g)] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. . . . [I]f the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it."). Even on *de novo* review, this Court can remand a disability claim to the plan administrator if the record is not sufficiently developed. *See, e.g.*, *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 944 (9th Cir. 1995).

3. In most cases, the Court reviews only the materials included in the record considered by the plan administrator. *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007) (citing *Mongeluzo*, 46 F.3d at 943-44). A court may exercise its discretion to consider evidence extrinsic to the administrative record when circumstances clearly establish the evidence is necessary to conduct an adequate *de novo* review. *Id*. Such exceptional circumstances may exist, for example, with claims requiring the consideration of complex medical questions or issues regarding the credibility of medical experts, or where a claimant could not have presented the additional evidence in the administrative process. *Id*. at 1217-18 (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025

(4th Cir. 1993)).

4.  Mr. Bunger submits extrinsic evidence in the form of an August 2017 declaration addressing his ongoing education at WGU. Dkt. 51. He also requests the opportunity to testify, should the Court wish to "test" his credibility. Dkt. 54 at 9. The declaration addresses the depiction of Mr. Bunger as a full-time student at WGU. Mr. Bunger clarifies his WGU classes take place on-line, at the time and in the amount of time of his choosing, entail his earning of "competency units", not credits, and that he spends, on average, only fifteen-to-twenty hours a week on his schooling. Dkt. 51 at 2. Mr. Bunger could have included this information in his January 2017 declaration. That declaration is a part of the administrative record and includes a discussion of Mr. Bunger's activities and their impact on his functioning, without any mention of his schooling. AR 854-56. Further, the information in the new declaration appears to relate solely to the period of time after July 5, 2015, and the determination of whether Mr. Bunger could work in any gainful occupation. Because the Court finds further proceedings necessary before such a determination can be made, it need not consider the new declaration in order to conduct an adequate *de novo* review of Mr. Bunger's exhausted claim. Nor is there any basis or need for Mr. Bunger to testify.

5.  Unum also takes issue with the record and arguments before the Court. Unum asserts Mr. Bunger submitted new, unrequested documents in an attempt to expand the record and improperly changed his theory. However, Mr. Bunger's unprompted submission of records was neither surprising, nor unwarranted. The Court remanded the case based on Unum's failure to sufficiently develop the record. Unum took no action for almost four months following remand and Mr. Bunger appropriately provided information identified by Unum

as pertinent to his claim. Mr. Bunger also complied once Unum made specific requests. All of the information provided is appropriately included in the record. The identification of other, previously undiagnosed conditions does not constitute an improper change in theory. As discussed below, the change in diagnoses is explained by the nature of the conditions at issue and the differential diagnostic technique commonly associated with those conditions. *Cf. Mongeluzo*, 46 F.3d at 944 ("[T]he claim of [CFS] is not a new claim, but simply a new explanation for Mongeluzo's disability.")

**B. ERISA Regulations on Remand**

1. ERISA regulations provide for procedures by which a claimant "shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(1). An appropriate named fiduciary may not be the individual who made the adverse determination at issue on appeal, nor that individual's subordinate. § 2560.503-1(h)(3)(ii). The fiduciary must consult with a health care professional who was not consulted in connection with the adverse benefit determination on appeal. § 2560.503-1(h)(3)(iii), (v).

2. Mr. Bunger asserts that the ERISA regulations governing appeals of adverse benefit determinations apply to court-ordered remands, and that Unum violated those regulations by allowing Mr. Jones to conduct the review after remand and through the continued consultation with Drs. Lyon and Bress during that review. Mr. Bunger avers the medical opinions generated during this procedurally flawed review are entitled to no deference and little weight. There is no binding authority supporting the applicability of the regulations at 29 C.F.R. § 2560.503-1 to all court-ordered remands. *But see Robertson v. Standard*

*Ins. Co.*, 28 F. Supp. 3d 1165, 1169 (D. Or. 2016) (adopting the Department of Labor's interpretation of its regulations in finding their application to court-ordered remands; remanding claim where defendant had failed to render a decision within forty-five days of prior court remand for administrative determination of whether a claimant was disabled). Nor was it apparent those regulations would appropriately apply in this case. The Court did not direct Unum to start anew with consideration of Mr. Bunger's claim, or to re-assign the claim to new administrative personnel or reviewing medical health care professionals. The Court directed Unum to take a specific course of action; that is, to inform Mr. Bunger of what additional testing or diagnostics it required in order to make an informed decision as to whether he is able to perform his job functions. It is not clear why Unum waited some four months before taking any action on remand. However, Mr. Bunger does not here maintain that delay constituted a violation of 29 C.F.R. § 2560.503-1. The Court does not find the involvement of Mr. Jones or the consultation with Drs. Lyons and Bress rendered the process on remand procedurally flawed. Moreover, if the Court did find the procedural violations alleged, the appropriate remedy considering the circumstances in this case would be a remand to Unum. *See Lafleur v. Louisiana Health Serv. & Indem. Co.*, 563 F.3d 148, 156-58 (5th Cir. 2009) ("Remand to the plan administrator for full and fair review is usually the appropriate remedy when the administrator fails to substantially comply with the procedural requirements of ERISA."); *accord Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1035 (9th Cir. 2006). Mr. Bunger does not seek or presumably desire such a remedy, and the Court instead proceeds to its *de novo* review of the record.

**C. Disability from Mr. Bunger's Own Job (August 30, 2014 through July 5, 2015)**

1. The same definition of disability applies to the period of time remaining in which Mr.

Bunger may be found eligible for STD benefits and for the first nine months of his eligibility for LTD benefits. At issue is whether Mr. Bunger establishes his limitation from performing the material and substantial duties of his job as a Web Content Specialist due to sickness from August 30 to October 4, 2014 under the STD plan and from October 5, 2014 to July 5, 2015 under the LTD plan.

2. Medical records added to the claim file following remand appear to eliminate Lyme disease and neurological or behavioral health explanations for Mr. Bunger's physical symptoms. A definitive diagnosis or explanation for those symptoms remains elusive, but includes CFS or fibromyalgia. The elimination of a number of different possible causes makes these remaining diagnoses of exclusion more likely to be accurate. AR 635-36. *See generally Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999) ("Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated.")

3. Among other symptoms, Mr. Bunger consistently reported fatigue, weakness, pain, difficulty focusing and concentrating, and anxiety associated with his physical symptoms. *See, e.g.*, STD 99-100, 243; LTD 46-74, 315, 329-36, 364, 374; AR 793. The symptoms waxed and waned, were difficult to predict, worsened following exertion, and persisted during Mr. Bunger's unsuccessful attempts to return to his job on a part-time basis between March and June 2015. *See, e.g.*, AR 778-79, 781-84, 786-93, 854-55. A claimant's subjective symptom reporting may serve as valuable evidence in support of a disability claim. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 677 ("[A] disability insurer [cannot] condition coverage on proof by objective indicators such as

blood tests where the condition is recognized yet no such proof is possible."); *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) ("[S]ubjective complaints of disabling conditions are not merely evidence of a disability, but are an 'important factor to be considered in determining disability.'") (quoted source omitted). While fairly described as reflecting minimal objective findings, the treatment records and examinations corroborate Mr. Bunger's reporting as to his symptoms and functional limitations. His claim also finds support in the evidence from every doctor who personally examined him, including Drs. Taggart, Sise, Badger, and Neiman. *See Salomaa*, 642 F.3d at 676 (finding medical opinions rendered following in-person examination more persuasive than contrary opinions from administrator's paper-only review); *Jebian v. Hewlett-Packard Co. Emple. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (while there is no rule in ERISA cases to accord special weight to opinions of a treating physician, a district court may, on *de novo* review, "take cognizance of the fact (if it is a fact in the particular case) that a given treating physician has 'a greater opportunity to know and observe the patient' than a physician retained by the plan administrator.") (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (quoted source omitted)). The evidence from Mr. Bunger and his medical providers and examiners credibly support his symptoms and their impact on his ability to perform the varied and complex tasks required by his job as a Web Content Specialist.

4. Pointing to the most recent, negative Lyme result and Dr. Taggert's diagnostic techniques, treatment protocol, and status as a naturopathic physician, Unum argues Dr. Taggart's incorrect treatment and diagnosis calls into question the validity of her opinions, and demonstrates her care did not meet the "generally accepted medical standards"

contemplated by the STD and LTD plans. STD 358, 377; AR 420, 450. Unum previously relied on evidence from Dr. Taggart in awarding Mr. Bunger STD benefits. It may not now rely on Dr. Taggart's professional qualifications as a basis for denying benefits given that it never provided this rationale during the administrative process. *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719-20 (9th Cir. 2012). Unum contends the "unreliability of Dr. Taggart is not the result of her naturopathic training per se, but rather arises from her demonstrably erroneous opinions and treatment." Dkt. 55 at 4. However, while Dr. Taggart's diagnosis of Lyme disease was not supported by further testing, she also diagnosed CFS and her use of multiple working diagnoses finds support in the opinion of Dr. Neiman and case law, as reflected below. Dr. Taggart's treatment records suffice to demonstrate Mr. Bunger was under the "regular care" of a physician as contemplated by the STD and LTD plans. *See* STD 358, 377; AR 420, 450. Her records provide pertinent observations and findings, and a longitudinal picture of Mr. Bunger's symptoms over time. While the evidence from Dr. Taggart does not alone suffice to establish disability, it need not and should not be considered in isolation. *Cf. Black & Decker Disability Plan*, 538 U.S. at 834 (ERISA plan administrator may not arbitrarily refuse to credit reliable evidence, including evidence from a treating physician).

5. Unum also denies the existence of support in the record for a diagnosis of either CFS or fibromyalgia, or a "sickness" under the STD and LTD plans. *See* Dkts. 49, 53 and 55. Unum asserts Dr. Neiman never made or explained an actual diagnosis of either condition, merely alluded to potential differential diagnoses, and lacked any direct knowledge of Mr. Bunger prior to November 2016. Unum contends Dr. Taggart's January 2014 CFS diagnosis failed to satisfy diagnostic criteria in that Mr. Bunger had not presented with

severe fatigue lasting six months or longer, other potential causes of symptoms had not been ruled out, and the existence of other criteria, as set forth by the Centers for Disease Control (CDC), had not been considered. Unum notes that Dr. Taggart has never diagnosed fibromyalgia, and that Dr. Neiman made findings inconsistent with such a diagnosis, including the absence of fibromyalgia tender points and an unremarkable CRP test. Unum urges the Court's acceptance of the opinions of Drs. Lyon, Bress, and Beth Schnars. As stated in the Court's July 2016 Order, Dr. Schnars opined prior to remand that the records did not identify an underlying etiology for reported fatigue given the absence of documented additional diagnostic criteria or basic in-office testing of cognitive functioning, and that Mr. Bunger did not receive the typical treatment for chronic fatigue, which is aerobic activity and cognitive behavioral therapy. Dkt. 24 at 16 (citing LTD 469-72). The Court is not persuaded by Unum's arguments.

6. Fibromyalgia is a rheumatic disease, with typical symptoms including chronic pain, multiple tender points, fatigue, stiffness, and sleep disturbances, *Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017) (cited source omitted), as well as "lack of concentration, changes in mood or thinking, anxiety and depression." *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech.*, 125 F.3d 794, 796 (9th Cir. 1997). CFS is a complex illness "'characterized by severe disabling fatigue and a combination of symptoms that prominently features self-reported impairments in concentration and short-term memory, sleep disturbances, and musculoskeletal pain.'" *Salomaa*, 642 F.3d at 677 (quoted source omitted). Neither condition is established through objective tests or evidence. *Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, 856 F.3d 686, 696 (9th Cir. 2017) (citing *Salomaa*, 642 F.3d at 678). Diagnosis is dependent on a patient's

subjective symptom reporting. *Revels*, 874 F.3d at 656 (fibromyalgia is diagnosed "'entirely on the basis of the patients' reports of pain and other symptoms.'") (quoting *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004)); *Salomaa*, 642 F.3d at 677-78 ("Many medical conditions depend on their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established under autopsy. In neither case can a disability insurer condition coverage on proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible."). The diagnostic process may evolve over time, as other diseases are excluded. *See Salomaa*, 642 F.3d at 677; *Kuhn v. Prudential Ins. Co. of Am.*, 551 F. Supp. 2d 413, 426-28 (E.D. Pa. 2008). Symptoms vary and neither the diagnostic criteria, nor the appropriate treatment to employ is clear-cut. *See Revels*, 874 F.3d at 656-57 (describing two sets of diagnostic criteria considered by the SSA for fibromyalgia, the more recent of which does not include the identification of tender points; noting symptoms may "'wax and wane,'" resulting in "'bad days and good days.'") (quoted source omitted)); *Salomaa*, 642 F.3d at 677 (CFS "'does not have a generally accepted 'dip-stick' test'" and the standard diagnostic technique "'includes testing, comparing symptoms to a detailed [CDC] list of symptoms, excluding other possible disorders, and reviewing thoroughly the patient's medical history.'") (quoting *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir. 1999)); and *Reddick v. Chater*, 157 F.3d 715, 727 (9th Cir. 1998) ("the CDC has made it clear that no definitive treatment for CFS exists"). *See also* https://www.cdc.gov/me-cfs/symptoms-diagnosis/diagnosis.html (primary symptoms occurring in "most" CFS patients include greatly lowered ability to do previous activities, fatigue lasting six months or longer, worsening symptoms following activity, and sleep problems; patient must also have either problems with thinking and

memory or worsening symptoms while standing or sitting upright; "[m]any but not all people" have other symptoms, most commonly pain, and "[s]ome people" may have symptoms such as tender lymph nodes or sore throat); and https://www.cdc.gov/arthritis/basics/fibromyalgia.htm (the "most common" fibromyalgia symptoms include pain/stiffness, fatigue/tiredness, depression and anxiety, sleep problems, problems with thinking, memory, and concentration, and headaches) (last viewed March 2018).

7.  Dr. Neiman specializes in rheumatology. *See* AR 633-36. He reasonably explained the multiple working diagnoses in the record and the differential diagnosis he adopted as based on the nature of CFS and fibromyalgia and the evidence excluding other explanations. *See e.g., Kuhn*, 551 F. Supp. 2d at 428-29 (diagnostic process that evolved over time and excluded diseases through a process of elimination and testing was "consistent with the process by which fibromyalgia typically is identified.") *See generally Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003) (discussing the validity and acceptance of differential diagnosis testimony and evidence). Results from the subsequent neurological examination by Dr. Liou and the January 2017 Lyme test provide further support for the remaining diagnoses of CFS and fibromyalgia. Dr. Neiman conducted an in-person evaluation and found Mr. Bunger's reports credible and no reason to suspect malingering or symptom magnification. AR 636. Likewise, Drs. Sise and Badger rendered opinions based on their in-person encounters with Mr. Bunger and found no basis for disbelieving his account of psychological symptoms occurring only secondary to his physical impairment. AR 626-31. The opinions of Drs. Neiman, Sise, and Badger are reliable, probative, and persuasive.

8.  In contrast, Drs. Lyon, Bress, Schnars, and Ursprung were unable to personally observe

Mr. Bunger or assess the credibility of his reporting. The opinions addressing Mr. Bunger's physical symptoms reflect a rigid approach to the symptomatology, diagnosis, and treatment of CFS and fibromyalgia. They appear to require an etiology, objective findings, and/or symptoms that may not exist, or courses of treatment that may not be warranted. *See, e.g.*, AR 360, 472-73, 883-87. The Court is not persuaded by the opinions of the reviewing physicians as they pertain to Mr. Bunger's ability to perform his own job.

9. The evidence of disability in this case is not overwhelming. The cause of Mr. Bunger's symptoms and the appropriate diagnosis remain unclear, and his claim necessarily relies in significant part on his subjective account. Dr. Taggart appeared to focus her treatment on a condition that was later ruled out. Most of the examinations occurred well after the time period relevant to the determination of whether Mr. Bunger could perform his own job, and at a time at which his symptoms had improved. However, the absence of additional evidence closer in time to the period under consideration resulted in part from Unum's failure to engage in the meaningful dialogue required by ERISA. As with the review conducted prior to remand, *see* Dkt. 24 at 20, Unum did not take the opportunity to request that Mr. Bunger attend an independent medical examination (IME). *Cf. Salomaa*, 642 F.3d at 676 (stating, in review for an abuse of discretion, that an insurer may have declined an opportunity to conduct an IME given the "risk that the physicians it employs may conclude that the claimant is entitled to benefits"); *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009) (finding, in review for an abuse of discretion, that insurer's use of a "'pure paper' review" raised "'questions about the thoroughness and accuracy of the benefits determination'") (quoted source omitted).

10. On balance, the evidence weighs in Mr. Bunger's favor and he meets his burden of

establishing his entitlement to disability benefits through July 5, 2015.  Whether as a result of CFS, fibromyalgia, or another condition, a preponderance of the evidence shows Mr. Bunger had a sickness precluding his ability to perform the high level of mental functioning required for the performance of his job as a Web Content Specialist, to sustain the necessary employment-related activities, or to maintain attendance at that job on a consistent basis.

**D. Disability From Any Gainful Occupation (July 6, 2015 through the present)**

1. Mr. Bunger also seeks a determination that he is unable to perform any gainful occupation and entitled to LTD benefits from July 6, 2015 through the present.  Mr. Bunger would not be entitled to those benefits if he was able to perform part-time work in any gainful occupation, whether or not offered by his employer, but chose not to.  AR 436.

2. As a general rule, an ERISA claimant "must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court."  *Diaz v. United Agric. Emp. Welfare Benefit Plan & Tr.*, 50 F.3d 1478, 1483 (9th Cir. 1995) (cited source omitted). This exhaustion requirement serves "important policy considerations, including the reduction of frivolous litigation, the promotion of consistent treatment of claims, the provision of a nonadversarial method of claims settlement, the minimization of costs of claim settlement and a proper reliance on administrative expertise."  *Id*.  Mr. Bunger's failure to exhaust his claim for LTD benefits in relation to any gainful occupation is not in dispute.

3. A court may exercise its discretion to excuse the exhaustion requirement where appropriate, such as where further proceedings before a plan administrator would be "futile or the remedy inadequate.'"  *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 & n.2 (9th Cir. 2008) (quoting *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir.

1980)).  Mr. Bunger argues remand would be futile given the reasonable presumption Unum would yet again deny his claim.  *Diaz*, 50 F.3d at 1485-86 (futility exception "is designed to avoid the need to pursue an administrative review that is demonstrably doomed to fail.")  He contends additional delay would not serve the primary ERISA goal of providing "'a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously.'"  *Boyd v. Bell*, 410 F.3d 1173, 1178 (9th Cir. 2005) (quoting *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993)).  Mr. Bunger maintains the existence of medical opinions and records timely, relevant to, and supporting his LTD claim in relation to the issue of any gainful occupation.

4.  An exception to the exhaustion requirement would not be appropriate in this case.  There are notable differences between both the issue to consider and the evidence dated before and after July 5, 2015.  According to both Mr. Bunger and Dr. Taggart, Mr. Bunger's symptoms began to improve at least as early as late February 2015.  *See* AR 792, 854.  His condition had further improved by September 2015, allowing for his return to his own, mentally demanding occupation for three full days a week.  AR 779, 781-84, 854.  In September 2016, Mr. Bunger reported successfully taking on-line classes in software development.  AR 628.  Dr. Sise, that same month, assessed Mr. Bunger with a fair ability to perform simple and repetitive tasks, and as fair to limited in all other respects.  AR 630.  In early November 2016, Dr. Neiman described Mr. Bunger as "about 70% better."  AR 633.  Later that month, Mr. Bunger had a normal neurological examination with Dr. Liou and reported his neurologic symptoms had "mostly improved." AR 707-14.  This and other evidence in the record raises serious questions as to whether Mr. Bunger would be able to demonstrate his inability to perform in any gainful occupation, on a full- or part-time basis.

Unum has never considered this claim. Nor has Unum considered other potentially relevant policy terms, such as the LTD plan limitation to only eighteen months total of benefits for disabilities primarily based on self-reported symptoms. *See* AR 436. Further proceedings are necessary to allow for consideration of Mr. Bunger's claim for disability under the LTD plan as of July 6, 2015.

5. While the additional delay imposed by remand is unfortunate, Mr. Bunger's concerns as to futility can be mitigated at least in part. The Court has determined Mr. Bunger had a sickness as required for coverage under the LTD plan through July 5, 2015. Further proceedings can include additional information relating to Mr. Bunger's condition on or after July 6, 2015, including his declaration regarding WGU. Unum must continue to engage in the meaningful dialogue required by ERISA and, in order to ensure a full and fair review of Mr. Bunger's remaining LTD claim, Unum should employ the services of different reviewing physicians and appoint an individual other than Mr. Jones to conduct the review.

## IV.    CONCLUSION

The Court hereby FINDS and ORDERS:

1) Defendant's Second Motion for Judgment (Dkt. 53) is DENIED.

2) Plaintiff's Second Motion for Judgment under Federal Rule of Civil Procedure 52 (Dkt. 47) is GRANTED in part and DENIED in part. Mr. Bunger establishes his disability under Unum's STD plan from August 30, 2014 to October 4, 2014, and under the LTD plan from October 5, 2014 to July 5, 2015, and is entitled to recover benefits. However, the Court REMANDS to Unum the issue of Mr. Bunger's entitlement to LTD benefits from July 6, 2015 and beyond.

3) The parties shall meet and confer regarding the appropriate amount of benefits owed and any prejudgment interest, and jointly submit a proposed judgment within **ten (10) days** of the date of this Order.

4) Plaintiff may also, within **ten (10) days** from the date of this Order, file a motion to recover any attorney's fees and costs sought. The motion shall be supported by documentary evidence reflecting the amount of fees and costs sought, and shall include argument as to the authority upon which fees and costs may be granted and why the fees sought are reasonable. Defendant shall file a response in accordance with the Local Rules and plaintiff may file a reply in accordance with the same.

5) This matter is now CLOSED.

DATED this 22nd day of March, 2018.



The Honorable Richard A. Jones
United States District Judge